**Charles J. HALON, Jr., Executor of the Estate of Bertha Kubilus and Personal Representative, Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, as Designee of Raymond P. Donovan, Secretary of Labor, Respondent.**

No. 82–3066.

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1982.

Reargued Before Original Panel May 16, 1983.

Decided July 15, 1983.

Rehearing and Rehearing En Banc Denied Sept. 12, 1983.

**22**

Maureen H. Kreuger, Krasno & Krasno, Pottsville, Pa., Thomas B. Rutter (argued), Rutter, Turner, Stein & Solomon, Philadelphia, Pa., for petitioner.

T. Timothy Ryan, Jr., Sol. of Labor, Donald S. Shire, Associate Sol., J. Michael O'Neill (argued), Asst. Counsel for Appellate Litigation, Mary-Helen Mautner, Bonnie J. Brownell, U.S. Dept. of Labor, Washington, D.C., for respondent.

J. Randolph Query, III, Douglas A. Smoot, Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., for amicus curiae Nat. Coal Ass'n.

Mark E. Solomons, Kilcullen, Wilson & Kilcullen, Chartered, Washington, D.C., Norman P. Hetrick, Tive, Hetrick & Pierce, Harrisburg, Pa., for amicus curiae Nat. Ass'n of Independent Insurers.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

On April 9, 1983 we granted the petition of the Director, Office of Workers' Compensation Programs, Department of Labor, for panel rehearing of our decision of October 22, 1982 granting the petition of Charles J. Halon, Jr., Executor of the Estate of Bertha Kubilus, for review of the denial of Mrs. Kubilus' claim for benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901–45 (1976 & Supp. V 1981). The case was set down for argument on May 16, 1983. We reinstate our October 22, 1982 judgment, 713 F.2d 30.

Mrs. Kubilus, who died while her claim was pending, was the widow of a coal miner. She filed a claim for survivors benefits on August 28, 1974. The claim was originally denied. The Black Lung Benefits Reform Act of 1977, Pub.L. 95–239, 92 Stat. 95, greatly liberalized the criteria for black lung benefits. Section 15 of that Act added a provision, now found at 30 U.S.C. § 945 (Supp. V 1981), for review of pending and previously denied claims. The 1977 Act also transferred most adjudicatory functions from the Department of Health, Education and Welfare to the Department of Labor. The section requiring review of pending or previously denied claims provides that the Secretary of Health, Education and Welfare (now the Secretary of Health and Human Services) shall on request review previously denied claims on the original record under the liberalized standard of the 1977 Act. If approved, such claims are certified to the Secretary of Labor for payment. 30 U.S.C. § 945(a)(2)(A). Any claim not so approved is referred to the Secretary of Labor for determination. 30 U.S.C. § 945(a)(2)(B). The Labor Department must take into account the evidence in the file. If that is insufficient for approval of the claim under the Black Lung Benefits Reform Act of 1977 the Secretary must provide an opportunity for the claimant to present additional evidence.

At the time of the passage of the Black Lung Benefits Reform Act of 1977 the Secretary of Health, Education and Welfare

was adjudicating claims under regulations found at Part 410 of Title 20, Code of Federal Regulations. Mindful of the fact that under 30 U.S.C. § 945 some pending and previously denied claims would be processed by HEW while others would be processed by Labor, Congress in section 2(c) of the 1977 Act provided that "total disability" has the meaning given to it by regulations of either Secretary. 30 U.S.C. § 902(f)(1). Section 2(c), however, dealt specifically with cases reviewed pursuant to 30 U.S.C. § 945 as follows:

Criteria applied by the Secretary of Labor in cases of—

(A) any claim which is subject to review by the Secretary of Health and Human Services or subject to a determination by the Secretary of Labor, under section 945(a) of this title;

(B) any claim which is subject to review by the Secretary of Labor under section 945(b) of this title; and

(C) any claim filed on or before the effective date of regulations promulgated under this subsection by the Secretary of Labor;

shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973, whether or not the final disposition of any such claim occurs after the date of such promulgation of regulations by the Secretary of Labor.

30 U.S.C. § 902(f)(2).

Under the statute, if the late Mr. Kubilus was permanently disabled by pneumoconiosis prior to his death, and the pneumoconiosis arose out of coal mine employment his widow was entitled to survivors benefits under the Act. 30 U.S.C. §§ 921(a), 902(b). The Secretary of Health, Education and Welfare adopted interim adjudicatory rules for the determination of the cause of such permanent disability. The regulation relevant to this case provides:

(b) *Interim Presumption.* With respect to . . . a survivor of a miner who dies before January 1, 1974, when such survivor timely files a claim for benefits, such miner will be presumed . . . to have been totally disabled due to pneumoconio-

sis at the time of his death, or his death will be presumed to be due to pneumoconiosis, as the case may be, if:

(1) One of the following medical requirements is met:

(i) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428);

. . .

(2) The impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment (see §§ 424.416 and 410.456).

20 C.F.R. § 410.490(b) (1978). The section 410.490(b) presumption is rebuttable, but permits a surviving widow to make out a prima facie case of permanent disability due to pneumoconiosis by producing an X-ray or autopsy finding of pneumoconiosis and evidence that the disease arose out of coal mine employment.

In addition, there is a statutory presumption with regard to the required showing that death or disability arose out of coal mine employment. A survivor who establishes that the miner had ten years of coal mine employment is entitled under 30 U.S.C. § 921(c)(1) (1976 & Supp. V 1981) to the rebuttable presumption that his pneumoconiosis arose out of such employment. Thus, combining the two presumptions, proof of ten years employment coupled with X-ray or autopsy evidence of pneumoconiosis establishes a prima facie case.

Mrs. Kubilus provided X-ray and autopsy evidence which could support a finding that the decedent had pneumoconiosis. She also attempted to prove ten years of coal mine employment, in order to take advantage of the presumption in 30 U.S.C. § 921(c)(1). The administrative law judge concluded that she had established no more than eight years of coal mine employment. The administrative law judge then considered whether she had, independent of any presumptions, established (1) that her husband was a coal miner, (2) that he had contracted pneumoconiosis out of that employment, and (3) that he was totally disabled as a result thereof. *See* 20 C.F.R. §§ 410.410, 410.416 (1978). The administrative law

judge concluded that there was no significant medical evidence of disability from pneumoconiosis and that the cause of death was cancer. On appeal the Benefits Review Board held that this decision was supported by substantial evidence. Judge Miller dissented on the ground that by virtue of 30 U.S.C. § 902(f)(2), Mrs. Kubilus was entitled to the presumption of the cause of the permanent disability in 20 C.F.R. § 410.-490(b). He would have held, as well, that there was undisputed record evidence that the pneumoconiosis arose out of coal mine employment, since no other source of the disease was suggested.

The petition for review to this court raises three claims. One claim is that the administrative law judge's decision that Mrs. Kubilus failed to establish ten years of coal mine employment is not supported by substantial evidence. In our previous decision we rejected that contention, and we reiterate that rejection. Petitioner concedes that on remand he must show that the disease arose out of Mr. Kubilus' coal mine employment. Another claim is that the question of length of coal mine employment should have been adjudicated under the more favorable rules for validation of employment embodied in the permanent regulations of the Department of Labor. 20 C.F.R. § 718 (1982). The respondent concedes that the criteria for validation of employment in Part 718 are more favorable to claimants such as Mrs. Kubilus and that a remand for a new adjudication by the administrative law judge is required.

The third claim is that Mrs. Kubilus was, as Judge Miller said, entitled to the benefit of the presumption in 20 C.F.R. § 410.-490(b). Because that purely legal issue was quite likely to be presented on remand, we addressed it, holding that 30 U.S.C. § 902(f)(2) mandated the application of the presumption. The petition for rehearing is addressed to that holding.

The Office of Workers' Compensation Programs and the amici urge that 20 C.F.R. § 410.490(b) (1982) is inapplicable to claims adjudicated by the Secretary of Labor pursuant to 30 U.S.C. § 945. They contend that the governing regulation is 20 C.F.R. § 727.203 (1982), which provides for a presumption of cause of disability upon proof of an X-ray or autopsy showing pneumoconiosis only in cases where at least ten years of coal mine employment is shown. They urge that 30 U.S.C. § 902(f)(2) should be understood as if it read:

> *Medical* criteria applied by the Secretary of Labor in case of [adjudications pursuant to 30 U.S.C. § 945] shall not be more restrictive than the *medical* criteria applicable to a claim filed on June 30, 1973 . . .

Respondent's Brief on Petition for Review at 32. This reading obviously would permit the application of 20 C.F.R. § 727.203, and thereby deny claimants who establish less than ten years of coal mine employment the benefit of the rebuttable presumption of cause of disability. The plain language of the statute does not suggest that Congress intended any such modification of the generic term "criteria." The legislative history is, at best, equivocal. References in debate to medical criteria are not dispositive, since medical criteria are included. The occasional specific mention of medical criteria does not support an inference that nonmedical criteria were to be excluded. Other remarks in the debate suggest that the criteria referred to include adjudicatory standards as well as medical standards. *See, e.g.,* Remarks of Congressman Perkins, 95 Cong.Rec. 3431 (Feb. 15, 1978); Remarks of Congressman Simon, *id.;* reprinted in *Legislative History of the Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977,* at 928–29, 930 (1979).

The only other argument of substance advanced by the Department of Labor and the amici for such a reading is that application of the presumption in 20 C.F.R. § 410.-490(b) will be costly. Patently, however, the entire reopening mechanism in 30 U.S.C. § 945 is costly. Moreover, the entire 1977 Act liberalizes the standards for availability of benefits. It would be strange, indeed, considering the overall thrust of the 1977 Act, to identify in 30 U.S.C. § 902(f)(2) a Congressional intention to be more fiscal-

ly prudent than elsewhere in the same statute.

Moreover, the reading which the Secretary of Labor would have us give to section 902(f)(2) would produce the anomalous result that in cases adjudicated by Health and Human Services the 20 C.F.R. § 410.490(b) presumption would apply, whereas in cases transferred to the Secretary of Labor it would not. Reading section 902(f)(2) and section 945 together, it seems extremely unlikely that Congress intended such a result. The plain language of both provisions suggests that in cases adjudicated pursuant to section 945 the rules of adjudication will be at least as favorable in the Labor Department as in the Department of Health and Human Services.

We therefore reinstate our prior judgment granting the petition for review and remanding to the Benefits Review Board for further proceedings consistent with this opinion.

WEIS, Circuit Judge, concurring and dissenting.

I agree with the majority that substantial evidence supports the finding of less than ten years of coal mine employment by George Kubilus. I concur in the decision to remand because the ALJ did not apply the Secretary of Labor's permanent regulations that were in effect at the time of the hearing. See 20 C.F.R. Part 718 (1982). I do not agree, however, that the Office of Workers' Compensation Programs should apply a presumption that total disability and death arose from pneumoconiosis. In my view, the "not more restrictive" language of the statute refers to medical criteria only, and therefore the Department of Labor regulation is valid. Accordingly, I dissent from that portion of the majority's opinion which holds otherwise.[1]

At the outset, it should be observed that the ALJ and the Benefits Review Board do

not have discretion to choose between the regulations of the Secretary of Labor and those of the Secretary of Health and Human Services. The black lung benefits legislation is divided into two programs, designated as Part B and Part C. See Act of December 30, 1969, Pub.L. 91–173, 83 Stat. 792 (codified as amended at 30 U.S.C. §§ 901–951 (1976 & Supp. V 1981)). The statute provides that regulations are to be promulgated by the Secretary of Health and Human Services for Part B, and by the Secretary of Labor for Part C. 30 U.S.C. § 902(f)(1) (Supp. V 1981). Therefore, when considering a claim filed under Part C, as was Mrs. Kubilus', the Benefits Review Board is bound by the regulations issued by the Secretary of Labor. The majority opinion must not be read to imply that a choice between the two sets of regulations exists in the administrative process.

This case presents a challenge to a regulation promulgated by the Secretary of Labor. Our function as a reviewing court is to determine whether that particular regulation complies with the enabling act. If it does not, then the Secretary of Labor must rewrite the regulation so that it does conform to the law. In my view, however, the regulation is faithful to the statute, and this is made clear by the legislative history.

Title IV of the Federal Coal Mine Health and Safety Act of 1969 was designed to provide benefits for miners who were "totally disabled" because of pneumoconiosis, and for the survivors of those who had died from the disease. See 30 U.S.C. § 901 (1976). Claimants were divided into two classes. One, designated in Part B of the statute, included those who filed claims before December 31, 1973. Id. §§ 921–925 (1976). This program was to be administered by the Secretary of Health, Education and Welfare through the Social Security Administration, and benefits were payable

---

1. The practical consequences of the majority's holding are neither limited to this case nor insignificant. The Director states that a significant number of the approximately 10,000 cases presently pending at various stages of the administrative and appeals process have been re-

viewed under the Department of Labor's regulation as written. In his Petition for Rehearing, the Director contends that the majority's interpretation exposes the Black Lung Disability Fund to a potential additional liability of $190,800,000. (Pet. for Rehearing at 2).

from federal funds. The sponsors of the Act labeled the Part B program a "one-shot effort." 115 Cong.Rec. 31, 589 (Oct. 27, 1969).

The second group, designated in Part C, consisted of those whose claims were filed after December 31, 1973. 30 U.S.C. §§ 931–941 (1976). This program was intended to function like workers' compensation in that benefits were generally payable by the employer. *Id.* § 932 (1976). Part C was to be administered by the Department of Labor, *see id.* § 902(c) (1976), although the original legislation gave the Secretary of HEW the authority to promulgate regulations for both Part B and Part C, *see id.* §§ 902(f), 932(h) (1976).

Congress became dissatisfied with HEW's administration of Part B and, in 1972, amended the Act to liberalize the eligibility requirements. Act of May 19, 1972, Pub. L. 92–303, 86 Stat. 150. Another objective of the new legislation was to reduce the huge backlog of unadjudicated Part B claims. In response to congressional pressure to adopt "such interim evidentiary rules and disability evaluation criteria as [would] permit prompt and vigorous processing" of these claims, S.Rep. No. 743, 92d Cong., 2d Sess., *reprinted in,* 1972 U.S.Code Cong. & Ad. News 2305, 2322, HEW drafted the interim adjudicatory rules published at 20 C.F.R. § 410.490 (1982).

The interim rules extended a presumption of total disability if the claimant met specified values for ventilatory studies, *id.* § 410.490(b)(1)(ii), and had worked for 10 years in a coal mine, *id.* § 410.490(b)(3). Alternatively, a claimant could demonstrate pneumoconiosis by an x-ray or biopsy report, *id.* § 410.490(b)(1)(i), and survivors could establish the presence of the disease through autopsy reports, *id.* In these situations, total disability was presumed if the miner met the medical requirements and had worked at least ten years in the mines. *Id.* § 410.490(b)(2); *see id.* §§ 410.416(a), 410.456(a). If the miner had less than ten years service, however, the presumption of disability arose only after the claimant established that the pneumoconiosis resulted from coal mine employment. *See id.* §§ 410.416(b), 410.456(b).

The HEW interim regulations were applicable only to Part B claims filed on or before June 30, 1973, and to claims by survivors of miners who died before January 1, 1974. *See* 20 C.F.R. § 410.490. They were not applicable, therefore, when the Department of Labor assumed administrative responsibility for claims filed under Part C. For Part C claims, HEW had promulgated a set of permanent regulations. *See id.* §§ 410.401–410.476.

In 1975, the House Committee on Education and Labor objected that "[t]he so-called 'permanent' medical standards now in effect under Part C are much more demanding than the so-called 'interim' standards applied by HEW under Part B." H.R.Rep. No. 770, 94th Cong., 1st Sess., *reprinted in, Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977,* Committee on Education and Labor 113, 126 (1979) [hereinafter cited as *1977 Legislative History*]. During that year, the House considered several amendments that would have required the Part C regulations to be rewritten with reference to the HEW interim regulations.

One bill specified that the Part C regulations should "not be more restrictive than the standards prescribed" by the interim regulations. H.R. 3333, 94th Cong., 1st Sess., § 3, *reprinted in, Black Lung Benefits Reform Act of 1975: Hearings on H.R. 7, H.R. 8, and H.R. 3333 Before Subcomm. on Labor Standards of the House Comm. on Education and Labor,* 94th Cong., 1st Sess. 6–12 (1975) [hereinafter cited as *1975 House Hearings*]. Another directed that the regulations for Part C claims "shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973." H.R. 10760, 94th Cong., 1st Sess., § 7(a), *reprinted in, 1977 Legislative History* 77, 83.

The HEW interim regulations, however, were themselves controversial. They aroused opposition from those who contended that the values in the ventilatory studies were too restrictive and biased against younger claimants. For example, while tes-

tifying on the measure in H.R. 3333, a staff attorney for the United Mine Workers said that "the after-July 1973 medical criteria should be no stricter than the before-July 1973 criteria," but nevertheless argued that the interim standards were too strict. *1975 Housing Hearings* at 60 (Statement of Gail Falk, Staff Attorney, UMW).

Others argued that the medical criteria in the interim regulations lacked scientific reliability. A member of the House Committee that reported H.R. 10760 cited testimony from the American Lung Association indicating that the HEW interim regulations were "based on medically unsound principles." H.R.Rep. No. 770, 94th Cong., 1st Sess. ("Separate Views of Mr. Erlenborn"), *reprinted in, 1977 Legislative History* 207, 209. Several other members of the committee who also opposed the legislation felt that the Part C regulations should "not be restricted to antiquated concepts." *Id.* ("Minority Views"), *reprinted in, 1977 Legislative History,* 191, 201.

Although the House approved H.R. 10760 in early 1976, 122 Cong.Rec. 4959–99 (Mar. 2, 1976), the Senate adjourned before taking any action on the House bill. Amendments similar to H.R. 10760 were introduced in the House in 1977. *See* H.R. 4389, 95th Cong., 1st Sess. (1977), *reprinted in, 1977 Legislative History* 437; H.R. 4544, 95th Cong., 1st Sess. (1977), *reprinted in, 1977 Legislative History* 468. The Senate also considered amendments in a bill drafted by its appropriate subcommittee. *See* S. 1538, 95th Cong., 1st Sess. (1977), *reprinted in, 1977 Legislative History* 636.

During consideration of these proposals, the interim standards promulgated by the Secretary of HEW were again addressed in hearings before subcommittees of both the House and Senate. Medical witnesses before the House committee disagreed about the validity of the Part B interim medical standards. The American Lung Association opposed legislation that would extend eligibility for benefits "without regard to sound medical criteria for the determination of such disability," and stated that "the adoption of these interim criteria would re-

sult in the determination of disability in individuals fully capable of . . . active employment." *Black Lung Benefits Provisions of the Federal Coal Mine Health and Safety Act: Hearings Before the House Comm. on Education and Labor,* 95th Cong. 1st Sess. 259–60 (1977) (statement of Dr. Hans Weill, President, American Thoracic Society) [hereinafter cited as *1977 House Hearings*].

Another medical witness testified that the interim criteria were "not based on substantial medical evidence that the criteria chosen were, in fact, equal to a disabling impairment." *Id.* at 274–75 (Statement of Dr. Harold I. Passes, Former Chief Medical Officer, Social Security Administration). The witness pointed out that the interim criteria "include many values, including pulmonary function standards, which were entirely normal," and discussed other medical techniques for evaluating disability. *Id.* at 275.

On the other hand, a physician speaking for the miners indicated his concern "about the medical standards that were raised" and interpreted the earlier testimony at the hearings as "being in favor of a more rigid medical standard." *Id.* at 283 (statement of Dr. Murray Hunter, Former Medical Director, Fairmont Clinic). He opposed that policy because "certain of the medical standards are too stringent." *Id.*

There was similar testimony before the Senate subcommittee. The chief of a medical consulting staff for the Social Security Administration testified that the interim regulations were drawn up in response to the congressional concern about the backlog of unadjudicated claims in 1972. *Oversight of the Administration of the Black Lung Benefits Program, 1977: Hearings Before the Subcomm. on Labor of the Senate Committee on Human Resources,* 95th Cong., 1st Sess. 193 (Statement of Herbert Blumenfeld, M.D., Chief, Medical Consulting Staff, Bureau of Disability Insurance, Social Security Administration). He explained that there were too many claims at that time to allow "physical performance tests." *Id.* Accordingly, it was necessary to establish "criteria which would detect disease," but

not necessarily a disabling level of impairment. *Id.* at 194. Thus, "the interim adjudicatory rules provide for allowing the claim if (1) a chest roentgenogram . . . establishes . . . pneumoconiosis, or (2) . . . ventilatory function values met a liberalized table." *Id.*

The Senate committee also considered a report by the Comptroller General recommending that if the Department of Labor were authorized to use the interim standards, the Secretary "should be directed to see that the degree of functional disability of the claimant is substantiated by medical evaluation." *Id.* at 261, 325.

Representatives of the Department of Labor, appearing before the Senate subcommittee in 1977, noted that there was justification for differing the standards for Parts B and C in that the programs were different in nature. The Department found "some difficulty . . . with the idea of simply adopting the interim standards for Part C," and asked that it be permitted to draft its own standards so that it could "take into consideration the latest developments in this still growing field of medicine." *Id.* at 139, 142 (Statement of Donald Elisburg, Assistant Secretary for Employment Standards). *See also 1977 House Hearings,* 241, 243–44 (same).

The House approved a provision requiring that the Part C regulations "not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973." H.R. 4544, 95th Cong., 2nd Sess., § 7(a) (1977), 123 Cong.Rec. 29,828. *See* H.R.Rep. No. 151, 95th Cong., 2d Sess. 15, *reprinted in,* 1978 U.S.Code Cong. & Ad.News 237, 251. The measure enacted by the Senate, however, authorized the Department of Labor to promulgate its own regulations for Part C without regard to the HEW interim regulations. S. 1538, 95th Cong., 2d Sess., § 2(c) (1977). *See* S.Rep. No. 209, 95th Cong., 1st Sess. 12–14, *reprinted in, 1977 Legislative History* 634. The differing House and Senate versions were then referred to a conference committee, and the compromise reached by the committee produced section

402(f) of the Act, 30 U.S.C. § 902(f) (Supp. V 1981).

Section 402(f)(1) gave the Secretary of Labor, for the first time, the authority to define "total disability" and promulgate regulations for processing claims under Part C. 30 U.S.C. § 902(f)(1). The Department of Labor was required to "establish criteria for all appropriate medical tests under this subsection which accurately reflect total disability." *Id.* § 902(f)(1)(D).

A limited number of claims were also subject to the provisions in section 402(f)(2). Section 435 of the statute, as amended, required HEW to review the evidence on file of all previously denied and pending Part B claims, taking into account the 1977 amendments. *Id.* § 945(a). If the claimant so requested or the claim was not approved, HEW was to refer the claim to the Department of Labor, *id.* §§ 945(a)(1)(B), 945(a)(2)(B)(i), with "an opportunity for the claimant to present additional medical or other evidence," *id.* §§ 945(b)(2)(B), 945(a)(1)(B). The Secretary of Labor was similarly directed to review all previously denied and pending Part C claims in light of the 1977 amendments. *Id.* § 945(b)(1). The conference committee's resolution provided that as to these reviewed and pending claims, and any claims filed before the Department of Labor issued its permanent regulations, the "[c]riteria applied by the Secretary of Labor . . . shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973." *Id.* § 902(f)(2).

The conference committee stated that whereas "[t]he House bill [bound] the Secretary of HEW to prescribing Part C regulations no more restrictive than" the interim regulations, "[t]he Senate amendment authorized the Secretary of Labor to promulgate new medical standards to be applied to all Part C claims and retained the standard-setting authority of the Secretary of HEW with respect to Part B claims." H.Conf. Rep. No. 864, 95th Cong., 2d Sess. 16, *reprinted in,* 1978 U.S.Code Cong. & Ad.News 308, 309. It then explained, "The conference substitute conforms to the Senate

amendment with the proviso that the so-called 'interim' part B medical standards are to be applied to all reviewed and pending claims. * * * [R]egulations [adopted by the Secretary of Labor for application to reviewed and pending claims] shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973, except that in determining claims under such criteria all relevant medical evidence shall be considered in accordance with standards prescribed by the Secretary of Labor and published in the Federal Register." *Id.*

In the only reference to the use of presumptions, the conference report states that "[t]he conferees also intend that all standards are to incorporate the presumptions contained in section 411(c) of the Act." *Id.* That section establishes a rebuttable presumption that pneumoconiosis arose out of coal mine employment "[i]f a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines." 30 U.S.C. § 921(c)(1).

When the conference report reached the floor of the Senate, Senator Jennings Randolph, one of the supporters of the bill, explained that the Department of Labor's review of denied and pending claims, and claims filed before promulgation of the permanent regulations, "will be accomplished with the use of the 'interim' *medical* standards which were in use after the Black Lung Amendments of 1972." 124 Cong. Rec. 2,330, 2,331 (Feb. 6, 1978) (emphasis added). Senator Jacob Javits also referred to review under "*medical* criteria no more restrictive than the so-called interim *medical* standards originally promulgated by HEW." *Id.* at 2,333 (emphasis added).

On the House floor, Representative Paul Simon asked Representative Carl Perkins, the floor manager, whether the review of denied or pending claims would be subject to "reconsideration under the so-called interim *medical* criteria." 124 Cong.Rec. 3,426, 3,431 (Feb. 15, 1978) (emphasis added). To this Mr. Perkins replied, "That is the intent of the legislation. * * * The new law speaks clearly to this issue; and the relevant legislative history and intent is equally clear. * * * Insofar as the interim standards address a *medical* criteria, they cannot be made more restrictive." *Id.* at 3,431. (emphasis added).

In response, Mr. Simon, also active on the House subcommittee and the conference committee that drafted the bill, stated that he was "pleased that the language in this bill is crystal clear on the subject of the *medical* standards that must be used. * * It should not be possible to misconstrue the meaning of this language. The Department of Labor is required to apply *medical* criteria no more restrictive than criteria being used ... on June 30, 1973." *Id.* (emphasis added).

In sum, this review of the extensive legislative history convinces me that the Director correctly reads the statute as requiring that no less restrictive *medical* criteria be incorporated by the Secretary of Labor into the regulations governing review of the case at hand. The legislative history extends over more than one session. The testimony of hearing witnesses, the reports of the congressional committees, and the statements of the legislators who guided the legislation from introduction to final passage are all consistent in designating the criteria referred to in section 402(f)(2) as "medical criteria."

A perusal of the regulation issued by the Secretary of Labor shows that its medical criteria are less restrictive than the HEW interim standards. It incorporates all of the medical criteria contained in the HEW interim regulation. *See* 20 C.F.R. § 727.-203(a)(1), (2). Moreover, the Department of Labor regulation provides additional means of proving the existence of pneumoconiosis that were not available under the HEW interim regulation. *See id.* § 727.203(3), (4), (5). As to proof that a miner's pneumoconiosis arose out of coal mine employment, the regulation incorporates, as directed by the conference committee report, the presumption contained in section 411(c)(1) of the Act, 30 U.S.C. § 921(c)(1). The Secretary of Labor, therefore, has complied with the intent of Congress and the regulation should be upheld. Cases in other courts of appeals have held that the regulation is less

restrictive. *See Underhill v. Peabody Coal Co.,* 687 F.2d 217 (7th Cir.1982); *Elkins v. Secretary of Health and Human Services,* 658 F.2d 437 (6th Cir.1981).

Furthermore, the regulation was submitted for comment to interested persons, including the members of the House committee. *See* 43 Fed.Reg. 36,818, 36,825–26 (Aug. 18, 1978). None of the congressmen was critical of the regulation's limitation to miners with at least ten years coal mine employment, although changes were made in other parts of the regulation before its promulgation.

Unfortunately, Congressman Simon's characterization of the language in section 402(f)(2) as being "crystal clear" has not come to pass. Nevertheless, I am convinced that the statute and the relevant legislative history makes clear that Congress intended the Secretary of Labor to incorporate only less restrictive *medical* criteria. Because the Secretary of Labor's regulation is valid, I dissent from the majority's direction that on remand the Benefits Review Board is to apply a different standard.