**Opal STRIKE, Widow of Roy Strike, Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT of LABOR, Respondent.**

**No. 85–3072.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1986.

Decided April 16, 1987.

Harold B. Culley, Jr., West Frankfort, Ill., for petitioner.

Brian E. Peters, U.S. Dept. of Labor, Washington, D.C., for respondent.

Before BAUER, Chief Judge, CUMMINGS and FLAUM, Circuit Judges.*

---

* Pursuant to Circuit Rule 40(f), this opinion has been circulated among all judges of this Court in regular active service. No judge favored a rehearing *in banc* on the question of creating a conflict with the decisions of a majority of the Third Circuit and the Eighth Circuit in *Halon v. Director, OWCP*, 713 F.2d 21 (3d Cir.1983), and *Coughlan v. Director, OWCP*, 757 F.2d 966 (8th Cir.1985).

CUMMINGS, Circuit Judge.

Opal Strike, the widow of Roy Strike, petitions for review of an order of the Department of Labor's Benefits Review Board ("the Board") affirming the decision of an Administrative Law Judge denying her claim for benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901–945. Mrs. Strike contends that the Board's decision that she was not entitled to the benefit of the interim presumption of total disability violates 30 U.S.C. § 902(f)(2). We agree with the respondent Director,[1] however, that the Board's interpretation of § 902(f)(2) is consistent with Congress' intent. The petition for review is therefore denied.

## I. Statutory and Regulatory Framework

Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, was designed to provide benefits to miners who were "totally disabled" as a result of pneumoconiosis arising out of coal mine employment and to survivors of miners who had died due to the disease. See 30 U.S.C. § 901(a). In an attempt to divide financial responsibility between the federal government and the coal industry, the legislative scheme created two separate and distinct programs for awarding black lung benefits. The first, designated as Part B, applied to claims filed on or before December 31, 1973. See 30 U.S.C. §§ 921–925 (1976). This program was to be administered by the Secretary of Health, Education, and Welfare[2] through the Social Security Administration, and benefits were to be payable from federal funds. The second, designated as Part C, applied to claims filed after December 31, 1973. See id. §§ 931–

941 (1976). This program was intended to function like workers' compensation. As a result, it was to be administered by the Department of Labor, and benefits were generally to be payable by the employer.[3] Under the original legislation, the Secretary of HEW was authorized to promulgate regulations, applicable to claims under both Part B and Part C, prescribing standards for determining whether a miner was totally disabled due to pneumoconiosis or whether a miner's death was due to the disease. Id. §§ 902(f), 921(b), 932(h) (1976). The Secretary of Labor, however, retained the authority to establish his own standards for determining whether a miner's pneumoconiosis arose out of coal mine employment. Id. § 932(h) (1976).

In response to dissatisfaction with HEW's administration of Part B, Congress enacted the Black Lung Benefits Act of 1972 which liberalized the eligibility requirements for benefit awards. In addition, to reduce the large backlog of unadjudicated Part B claims, Congress urged HEW to adopt "such interim evidentiary rules and disability evaluation criteria as [would] permit prompt and vigorous processing" of those claims. S.Rep. No. 743, 92d Cong., 2d Sess., reprinted in 1972 U.S. Code Cong. & Admin.News 2305, 2322. Congress noted that the facilities and medical tests necessary to evaluate disability due to pneumoconiosis were not then available and that the Part B claims had to be handled notwithstanding the limited medical resources and techniques. Id.

HEW responded by adopting a set of interim adjudicatory rules set out at 20 C.F.R. § 410.490. Section 410.490(b) created a rebuttable presumption of total disability due to pneumoconiosis arising out of

---

1. The Acting Director, Office of Workers' Compensation Programs, United States Department of Labor, is Richard A. Staufenberger.

2. The Department of Health, Education, and Welfare (HEW) has been superseded by the Department of Health and Human Services (HHS). However, because the legislative history analyzed at length in Part III refers exclusively to HEW, we will use HEW instead of HHS throughout the opinion in an attempt to minimize confusion.

3. Title II of the Federal Coal Mine Health and Safety Act required coal mine operators to attain specified levels of average coal dust concentrations in the mines by December 30, 1972. See 30 U.S.C. § 842(b). Once these concentrations had been attained, federal responsibility for the payment of black lung benefits under Part B terminated and liability was shifted to coal mine operators under Part C.

coal mine employment if certain conditions were met:

(b) *Interim presumption.* With respect to a miner who files a claim for benefits before July 1, 1973, and with respect to a survivor of a miner who dies before January 1, 1974, when such survivor timely files a claim for benefits, such miner will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of his death, or his death will be presumed to be due to pneumoconiosis, as the case may be, if:

(1) One of the following medical requirements is met:

(i) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.-428); or

\*     \*     \*     \*     \*     \*

(2) The impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment (see §§ 410.416 and 410.456).

Under the regulations set out at 20 C.F.R. §§ 410.416 and 410.456, a miner could satisfy the (b)(2) condition if he had worked in coal mines for 10 or more years. Otherwise the miner was required to prove that his disease arose out of coal mine employment.

The interim adjudicatory rules of § 410.-490 applied only to Part B claims filed by miners before June 30, 1973, and to claims filed by survivors of miners who died before January 1, 1974. They did not apply to Part C claims, which were to be governed by a set of permanent regulations promulgated by HEW. See 20 C.F.R. §§ 410.401–410.476. The Part C permanent regulations were significantly more demanding than the Part B interim rules, and as a consequence, the claim approval rate was much lower under Part C than Part B. This discrepancy led to over two years of hearings and debate in Congress between 1975 and 1977 on various bills proposing amendments to the standards

employed in adjudicating Part C claims. The end result of this lengthy legislative process was the Black Lung Benefits Reform Act of 1977.

In addition to modifying the evidentiary requirements necessary to establish entitlement to benefits and eliminating certain restrictions on the filing of claims, the 1977 Act made two significant changes in the administration and processing of black lung benefits claims. First the Act transferred the authority to promulgate regulations for Part C claims from the Secretary of HEW to the Secretary of Labor. 30 U.S.C. § 902(f)(1). The Secretary of Labor was directed to define "total disability," *id.,* and to "establish criteria for all appropriate medical tests under this subsection which accurately reflect total disability in coal miners," *id.* § 902(f)(1)(D).

The Act also directed the Secretary of HEW and the Secretary of Labor to undertake a review of all pending and previously denied claims in light of the amendments made by the Act. *Id.* § 945. Upon the request of a claimant, the Secretary of HEW was to review all pending and previously denied Part B claims based on the evidence in the file, but taking into account the 1977 amendments. *Id.* § 945(a)(1). If the claim was not approved, it was to be referred to the Secretary of Labor "with an opportunity for the claimant to present additional medical or other evidence." *Id.* §§ 945(a)(2)(B)(i) and 945(a)(1)(B). Any such claim was to be treated as if it had been originally filed under Part C. *Id.* § 945(a)(3)(A). The Secretary of Labor was similarly instructed to review all pending and previously denied Part C claims in light of the 1977 amendments. *Id.* § 945(b)(1). In reviewing any Part B claim referred by HEW under § 945(a) or any Part C claim under § 945(b), the Secretary of Labor was required to apply "criteria ... not ... more restrictive than the criteria applicable to a claim filed on June 30, 1973." *Id.* § 902(f)(2).[4]

---

4. The "not more restrictive" criteria were also to be applied to any claim filed after March 1, 1978, but on or before the effective date of the

permanent Part C regulations issued by the Secretary of Labor (April 1, 1980).

In 1978 the Secretary of Labor promulgated a set of regulations governing the review of pending and previously denied claims under § 945. 20 C.F.R. § 727.203(a) creates a rebuttable presumption of total disability incorporating medical criteria identical to those used in § 410.490. It provides in pertinent part:

(a) *Establishing interim presumption.* A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:

(1) A chest roentgenogram (X–ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428 of this title);

(2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2) of this title) * * *;

(3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood * * *;

(4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment;

(5) In the case of a deceased miner where no medical evidence is available, the affidavit of the survivor of such miner or other persons with knowledge of the miner's physical condition, demonstrates the presence of a totally disabling respiratory or pulmonary impairment.

This presumption differs from the § 410.490 interim presumption in that its availability is conditioned on proof of ten years of coal mine employment. Under § 410.490(b)(2), a miner with less than ten years of service could invoke the presumption by submitting evidence establishing that his respiratory or pulmonary impairment arose out of coal mine employment.

In 1980 the Secretary of Labor issued permanent regulations applicable to the adjudication of all Part C claims filed after March 31, 1980. 20 C.F.R. §§ 718.1–718.404. Section 727.203(d) provides that a claimant who fails to establish his entitlement to benefits under the terms of the interim presumption may attempt to establish his eligibility under the permanent regulations found in Part 718. See also 20 C.F.R. § 718.2. First the claimant must establish that the miner's pneumoconiosis arose at least in part out of coal mine employment. If a miner was employed in coal mines for ten or more years, Section 718.203(b) creates a rebuttable presumption that the pneumoconiosis arose out of that employment. Otherwise the claimant must present competent evidence establishing a relationship between the disease and coal mine employment. Second the claimant must show that the pneumoconiosis is, or at the time of the miner's death was, totally disabling according to the standards set out in § 718.204(c) or that the disease caused the miner's death according to the criteria set out in § 718.205(b).

## II. Factual Background

The petitioner, Opal Strike, is the widow of Roy Strike, a miner who worked in coal mines for nine and one-half years between 1945 and 1955. Following his coal mine employment, Mr. Strike worked as a drill press operator in a small machine shop and as a shipper. In 1974 he contracted lymphoma and underwent chemotherapy treatment. Mr. Strike died on April 4, 1975. The cause of death was listed as pneumonia due to the lymphoma. The autopsy report dated April 4, 1975, set forth clinical diagnoses of generalized lymphoma, pneumonia and other conditions, but made no mention of pneumoconiosis.

The petitioner filed a claim for survivor's benefits under Part C on June 12, 1975. The Department of Labor denied the claim on November 28, 1979. At the petitioner's request, a formal hearing was held before an Administrative Law Judge ("ALJ") on

July 20, 1982. On May 11, 1983, the ALJ issued a decision and order denying the petitioner's claim. Because the claim was pending at the time the 1977 Act was enacted, it was subject to review under 30 U.S.C. § 945(b)(1). The ALJ concluded, however, that the petitioner was not entitled to the benefit of the § 727.203(a) interim presumption of total disability because Mr. Strike had not been employed in coal mines for ten or more years. Proceeding to review the claim under the permanent regulations in Parts 410 and 718, the ALJ found that although the X–ray interpretations and medical reports established the existence of pneumoconiosis, there was insufficient evidence to establish that Mr. Strike was totally disabled due to pneumoconiosis or that his death was caused by the disease.

The petitioner appealed the ALJ's decision and order to the Benefits Review Board. She argued that the denial of benefits was in violation of 30 U.S.C. § 902(f)(2), which as set out above prohibits the Secretary of Labor from applying more restrictive criteria in reviewing claims under § 945(b) than the criteria applicable to a claim filed on June 30, 1973. Had the petitioner's claim been filed on June 30, 1973, it would have been subject to the Part B interim presumption at 20 C.F.R. § 410.490(b). The petitioner contended that under that standard she would have been eligible for benefits because she had submitted evidence establishing that her husband's lung disease arose out of his coal mine employment, even though he had worked for fewer than ten years. Because the ten-year requirement of the 20 C.F.R. § 727.203(a) presumption is in a certain sense more restrictive than the § 410.-490(b) presumption, the petitioner maintained that her claim for benefits was improperly denied contrary to § 902(f)(2).

The Benefits Review Board rejected the petitioner's argument. It instead took the position that the "criteria" referred to in § 902(f)(2) encompassed only medical criteria, and not all of the adjudicatory criteria used in reviewing claims under § 410.490. Because the § 727.203(a) interim presumption incorporates less restrictive medical criteria than the § 410.490 presumption, the Board concluded that the former does not run afoul of § 902(f)(2). The petitioner has sought review of the Board's decision affirming the ALJ's denial of benefits.

### III. 30 U.S.C. § 902(f)(2)

The issue raised by this appeal is one of statutory construction. The respondent argues that the term "criteria" in § 902(f)(2) *infra* refers only to medical criteria whereas the petitioner maintains that Congress intended the term to include evidentiary rules and adjudicatory standards as well. If the petitioner is correct, then she is clearly entitled to the benefit of the interim presumption of total disability for Part B claims at 20 C.F.R. § 410.490(b), and her claim for benefits was wrongly denied contrary to § 902(f)(2). If, on the other hand, the respondent is correct that the § 902(f)(2) prohibition extends only to medical criteria, then the petitioner's claim was properly adjudicated under the Part C interim presumption at 20 C.F.R. § 727.-203(a), and the Board's order denying her benefits must be affirmed.

Although the question presented is one of first impression in this Circuit, both the Third and Eighth Circuits have previously interpreted § 902(f)(2). In *Halon v. Director, OWCP*, 713 F.2d 21 (3d Cir.1983), the Third Circuit, over a strong dissent by Judge Weis, held that the criteria referred to in § 902(f)(2) were intended to include adjudicatory standards as well as medical standards. The court concluded that the "plain language of the statute does not suggest that Congress intended any such modification of the generic term 'criteria,'" and characterized the legislative history as "at best, equivocal." *Id.* at 24. The Eighth Circuit, in *Coughlan v. Director, OWCP*, 757 F.2d 966, 968 (8th Cir.1985), essentially adopted the position of the Third Circuit, commenting that "the construction urged by the Department here has little to recommend it."

We cannot agree with the conclusion reached by these two courts. When § 902(f) is read as a whole, the plain language of the statute in no way unambig-

uously suggests that the term "criteria" was intended to be generic. Subsection (f) provides in part:

(f)(1) The term "total disability" has the meaning given it by regulations of the Secretary of Health and Human Services for claims under Part B of this subchapter, and by regulations of the Secretary of Labor for claims under Part C of this subchapter * * * except that—

\* \* \* \* \* \*

(D) the Secretary of Labor, in consultation with the Director of the National Institute for Occupational Safety and Health, shall establish criteria for all appropriate medical tests under this subsection which accurately reflect total disability in coal miners as defined in subparagraph (A).

(2) Criteria applied by the Secretary of Labor in the case of [claims subject to review under 30 U.S.C. § 945 and claims filed on or before the effective date of regulations promulgated under this subsection by the Secretary of Labor] shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973, whether or not the final disposition of any such claim occurred after the date of such promulgation of regulations by the Secretary of Labor.

From the above, it is certainly arguable, as respondent contends, that the "criteria" referred to in (f)(2) are the "criteria for all appropriate medical tests ... which accurately reflect total disability in coal miners" which the Secretary of Labor was directed to establish in (f)(1)(D).[5] Because we agree with the respondent that the plain meaning of the statute is ambiguous, we proceed to review the legislative history of § 902(f) to determine whether the Secretary's construction is consistent with Congress' intended meaning. *E.g., Cass v. United States,* 417 U.S. 72, 77–79, 94 S.Ct. 2167, 2170–71, 40 L.Ed.2d 668.

Although both the Third and Eighth Circuits dismissed the legislative history as equivocal, neither opinion reveals more than a cursory analysis of the material. We are instead persuaded by the careful review of the extensive legislative history, which spanned more than one session, undertaken by Judge Weis in his dissent in *Halon,* 713 F.2d at 25. He concluded that "[t]he testimony of hearing witnesses, the reports of the congressional committees, and the statements of the legislators who guided the legislation from introduction to final passage are all consistent in designating the criteria referred to in section [9]02(f)(2) as 'medical criteria.'" *Id.* at 29. Our review of the relevant legislative history yields an identical result.

The impetus for the legislative reform ultimately enacted as the Black Lung Benefits Reform Act of 1977 was the disparity between the interim regulations applicable to Part B claims and the permanent regulations, promulgated by HEW, for Part C claims. In 1975 the House Committee on Education and Labor reported:

For some inexplicable reason, the Department of Health, Education, and Welfare, exercising authority provided under the current law, has literally saddled the Department of Labor with rigid and difficult medical standards for measuring claimant eligibility under part C of the program. The so-called "permanent" medical standards now in effect under part C are much more demanding than the so-called "interim" standards applied by HEW under part B of the program.

H.R.Rep. No. 770, 94th Cong., 1st Sess. (1975), reprinted in House Comm. on Education and Labor, 96th Cong., 1st Sess.,

---

5. In fact, in *Peabody Coal Co. v. Director, OWCP,* 778 F.2d 358, 361–62 (7th Cir.1985), although the question raised here was not directly presented, this Court stated:

Section 902(f)(1)(D) directs the Secretary to "establish criteria for all appropriate medical tests which accurately reflect total disability in coal miners." Section 902(f)(2) provides that the criteria applied to a claim filed before the effective date of the 902(f)(1) regulations be "no more restrictive" than those applied to a claim filed on June 30, 1973, *i.e.,* the interim presumptions promulgated by the Secretary of Health and Human Services at 20 C.F.R. § 410.490 (1985). Since the § 727.203(a) presumptions embody medical criteria "no more restrictive" than the 410.490 benchmark criteria, § 727.203(a) is consonant with the language of the Act.

Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977, at 113, 126 (Comm.Print 1979) (hereinafter cited as Black Lung Reform). The House considered a number of bills proposed during that year that would have required the Part C regulations to be rewritten in conformance with the Part B interim regulations. The version ultimately adopted provided that "[w]ith respect to a claim filed after June 20, 1973, such regulations [defining total disability] shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973." H.R. 10760, 94th Cong., 1st Sess. § 7(a), 122 Cong.Rec. 4,980 (1976).

The Senate adjourned before taking any action on H.R. 10760, but the House adopted an identical bill in 1977. H.R. 4544, 95th Cong., 1st Sess. § 7(a), 123 Cong.Rec. 29,828 (1977). Although the language of the bill referred to "criteria," the accompanying House Report explained that "[t]his provision ... would require that standards no more restrictive than the 'interim' medical standards [under Part B] shall be equally applicable to part C claims." H.R.Rep. No. 151, 95th Cong., 1st Sess. 15, reprinted in 1978 U.S.Code Cong. & Admin.News 237, 251.

The House approach was soundly criticized by those who believed that the medical criteria incorporated in the interim regulations were scientifically unreliable. The American Lung Association testified that the proposed legislation would extend eligibility for benefits "without regard to sound medical criteria for the determination of such disability" and that "the adoption of these interim criteria would result in the determination of disability in individuals fully capable of ... active employment." Black Lung Benefits Provisions of the Federal Coal Mine Health and Safety Act: Hearings Before the House Comm. on Education and Labor, 95th Cong., 1st Sess. 259–260 (1977) (statement of Dr. Hans Weill, American Thoracic Society). The chief of the Social Security Administration's Medical Consulting Staff explained that the interim regulations were principally designed to allow the efficient processing of the backlog of unadjudicated Part B

claims and that although the criteria adopted detected disease, they did not necessarily indicate a disabling level of impairment. Oversight of the Administration of the Black Lung Program, 1977: Hearings Before the Subcomm. on Labor of the Senate Comm. on Human Resources, 95th Cong., 1st Sess. 193–194 (statement of Herbert Blumenfeld, M.D.).

Representatives of the Department of Labor appeared before the Senate Subcommittee on Labor in 1977 and argued against having identical standards govern both Part B and Part C claims since the two programs were intended to be very different in nature, Part B being a traditional welfare benefits program and Part C being a workers' compensation program. They requested that the Department be permitted to draft its own medical standards for Part C so that it could "take into consideration the latest developments in this still-growing field of medicine." Id. at 142 (statement of Donald Elisburg, Assistant Secretary for Employment Standards). The Senate adopted the approach advocated by the Department of Labor and enacted a bill which authorized the Department to draft its own regulations for Part C without regard to the HEW interim regulations for Part B.S. 1538, 95th Cong., 1st Sess. § 2(c) (1977), reprinted in Black Lung Reform 631, 637–638. The accompanying Senate Report directed the Secretary of Labor, in consultation with the National Institute for Occupational Safety and Health, to "establish criteria for all medical tests which accurately reflect total disability in coal miners." S.Rep. No. 209, 95th Cong., 1st Sess. 13 (1977), reprinted in Black Lung Reform 604, 616. During the Senate debate on S. 1538, Senator Randolph commented that the Department of Labor would now be able to establish its own "medical criteria" for defining total disability under Part C. 123 Cong.Rec. 24,-239 (July 21, 1977).

The differing House and Senate bills were referred to a conference committee in late 1977. 30 U.S.C. § 902(f) supra was part of the compromise reached by the committee. Section 902(f)(1) incorporated

the Senate proposal that the Secretary of Labor be authorized to establish "criteria for all appropriate medical tests ... which accurately reflect total disability in coal miners" for all Part C claims. Following the House bill, Section 902(f)(2) directed the Secretary of Labor to review all pending and previously denied claims using criteria "not more restrictive" than the Part B interim regulations.

The Joint Explanatory Statement of the conference committee is particularly instructive in determining precisely what Congress intended by its use of the term "criteria" in § 902(f)(2). After reviewing the principal provisions in both the Senate and House bills concerning the promulgation of "medical standards for the determination of total disability" for both Part B and Part C claims, the conference committee explained:

> The conference substitute conforms to the Senate amendment with the proviso that the so-called "interim" part B medical standards are to be applied to all reviewed and pending claims filed before the date the Secretary of Labor promulgates new medical standards for part C cases.

> The conferees intend that the Secretary of Labor shall promulgate regulations for the determination of total disability or death due to pneumoconiosis. With respect to a claim filed or pending prior to the promulgation of such regulations, such regulations shall not provide more restrictive criteria than those applicable to a claim filed on June 30, 1973, except that in determining claims under such criteria all relevant medical evidence shall be considered in accordance with standards prescribed by the Secretary of Labor and published in the Federal Register.

H.R.Conf.Rep. No. 864, 95th Cong., 2d Sess. 16, reprinted in 1978 U.S.Code Cong. & Admin.News 308, 309. The committee's repeated reference to "medical standards" and "medical evidence" provides strong support for the proposition that by using the term "criteria" in § 902(f)(2), Congress meant to refer only to those medical criteria used to establish total disability and not

to all of the general adjudicatory criteria incorporated in the Part B interim regulations.

This conclusion is further supported by comments made on both the House and Senate floors during consideration of the conference report. Senator Randolph, a supporter of the bill, explained that the Department of Labor's review of denied and pending claims would be "accomplished with the use of the 'interim' medical standards" under Part B. 124 Cong.Rec. 2,331 (Feb. 6, 1978). Senator Javits also referred to review under "medical criteria no more restrictive than the so-called interim medical standards which were originally promulgated by HEW." *Id.* at 2,333.

On the House floor, Representative Simon asked Representative Perkins whether the review of denied or pending claims would be subject to "reconsideration under the so-called [Part B] interim medical criteria." 124 Cong.Rec. 3,431 (Feb. 15, 1978). Representative Perkins replied: "That is the intent of the legislation.... The new law speaks clearly to this issue; and the relevant legislative history and intent is equally clear.... Insofar as the interim standards address a medical criteria, they cannot be made more restrictive." *Id.* Representative Simon, who was active on the House subcommittee and the conference committee that drafted the bill, then concluded:

> I am pleased that the language in this bill is crystal clear on the subject of the medical standards that must be used ... in reviewing all pending and denied claims.... It should not be possible to misconstrue the meaning of this language. The Department of Labor is required to apply medical criteria no more restrictive than criteria being used ... on June 30, 1973.

*Id.*

The only reference to the use of presumptions in the conference report stated that "[t]he conferees also intend that all standards are to incorporate the presumptions contained in section 411(c) of the Act [30 U.S.C. § 921(c)]." H.R.Conf.Rep. No.

864, 95th Cong., 2d Sess. 16, reprinted in 1978 U.S.Code Cong. & Admin.News 308, 309. That Section creates a rebuttable presumption that pneumoconiosis arose out of coal mine employment "[i]f a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines." 30 U.S.C. § 921(c)(1). The Part C interim regulation promulgated by the Department of Labor, 20 C.F.R. § 727.203(a), expressly incorporates this ten-year presumption. That the conference committee's reference to the presumption was separate and distinct from its discussion of the medical standards to be used in reviewing pending and previously denied claims further persuades us that the restriction of § 902(f)(2) was meant to be limited to medical criteria necessary to establish the disease and total disability.

Finally, the members of the House Committee on Education and Labor, who were responsible for originally drafting the "not more restrictive" language, reviewed and commented on the Secretary of Labor's proposed Part C interim regulations, including § 727.203, before they were adopted in final form. Although they expressed some concern about the kind of medical evidence necessary to establish the presumption of total disability, none were critical of the fact that the regulation required proof of at least ten years of coal mine employment. See 43 Fed.Reg. 36,818, 36,825–36,826 (Aug. 18, 1978).

While Representative Simon's characterization of the language in § 902(f)(2) as being "crystal clear" has seemingly not proved accurate, we are nonetheless convinced that the statute and the relevant legislative history do make clear that in enacting § 902(f)(2), Congress only intended to prohibit the Secretary of Labor from applying more restrictive medical criteria in reviewing previously denied and pending claims pursuant to § 945. The Part C interim regulation, § 727.203, comports with this interpretation of the statute. Not only does it incorporate all of the medical criteria contained in the HEW interim regulation, see § 727.203(a)(1), (2), it also provides additional means of proving total disability due to pneumoconiosis that were not avail-

able under the HEW regulation, see § 727.-203(a)(3), (4), (5). See *Peabody Coal Co. v. Director, OWCP*, 778 F.2d 358, 361–362 (7th Cir.1985); *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439–40 (6th Cir.1981).

■ The Chicago Area Black Lung Association, which filed an *amicus curiae* brief in this case, argues that the provision in the HEW interim regulation which permits claimants to present direct proof that the miner's respiratory or pulmonary impairment arose out of coal mine employment in order to establish total disability, 20 C.F.R. § 410.490(b)(2), is itself a medical criterion. Because the Department of Labor's interim presumption regulation conditions a finding of total disability on proof of at least ten years of coal mine employment instead of direct proof of causation, the *amicus* maintains that it is impermissibly more restrictive, even with respect to medical criteria, than the HEW interim regulation.

We cannot agree that an evidentiary rule providing for the direct proof of causation is a medical criterion. Both the Part B and Part C interim regulations operate to create the presumption, in the case of a miner's claim for benefits, that the miner is totally disabled due to pneumoconiosis arising out of coal mine employment or, in the case of a survivor's claim for benefits, that the miner was totally disabled at the time of his death due to—or his death was actually caused by—pneumoconiosis arising out of such employment. To invoke the presumption, a claimant must demonstrate two distinct things. First he must establish the existence of a chronic respiratory or pulmonary impairment. This can be accomplished by satisfying one of various medical standards set out in either § 410.-490(b)(1) or § 727.203(a). Second he must show causation, *i.e.*, that the disease arose out of coal mine employment. Under the Part B presumption, causation may be established either by direct proof or by evidence of at least ten years of coal mine employment. 20 C.F.R. § 410.490(b)(2). Under the Part C presumption, causation may be established only by submitting evi-

dence of at least ten years of coal mine employment. 20 C.F.R. § 727.203(a).

■ Section 902(f)(2) *supra* clearly prohibited the Secretary of Labor in promulgating the Part C interim regulations from adopting more restrictive medical standards for establishing the first prong of the presumption, namely the existence of a chronic respiratory or pulmonary impairment. To say that § 902(f)(2) also prohibited the Secretary from adopting more restrictive methods of proving causation because such evidentiary rules constitute medical criteria is to deprive the latter term of all reasonable meaning. As discussed above, the conference committee in its report clearly differentiated between the medical standards used to establish the existence of an impairment and thereby define total disability on the one hand, and the presumptions, found in 30 U.S.C. § 921(c), used to establish causation on the other. Moreover, prior to the 1977 Act, the existing legislative scheme authorized the Secretary of Labor to establish his own standards under Part C for determining whether a miner's pneumoconiosis arose out of coal mine employment, even though he was obligated to follow HEW's medical standards defining total disability. 30 U.S.C. § 932(h) (1976). While the 1977 Act clearly affected the medical standards to be applied by the Secretary of Labor in processing Part C claims—directing the Secretary to promulgate his own standards defining total disability for prospective claims and mandating that he use the Part B interim standards for reviewing pending and previously denied claims—nothing in that legislation purported to alter the Secretary's authority to develop standards for establishing causation.[6] Thus as long as the Secretary did not adopt more restrictive medical standards governing total disability in his interim Part C regulations, he could in accordance with § 902(f)(2) modify the evidentiary rules with regard to causation contained in § 410.490.[7]

■ Because we hold that the Secretary of Labor was not obligated by § 902(f)(2) to incorporate the provision in § 410.490 permitting direct proof of causation in the § 727.203 interim presumption, the petitioner's claim for benefits was properly considered under the terms of § 727.203(a). We appreciate that the Part C interim presumption may yield different results than the Part B presumption for miners with fewer than ten years of coal mine employment. From their inception in 1969, however, the Part B and Part C programs were intended to be separate and distinct. This difference was only accentuated in 1977 when Congress delegated the regulatory authority with respect to Part C claims to the Secretary of Labor while leaving the regulatory authority with respect to Part B claims with the Secretary of HEW. Until permanent Part C regulations could be promulgated, Congress mandated in § 902(f)(2) that the Part B interim medical standards be applied by the Secretary of Labor in reviewing pending and previously denied Part C claims pursuant to § 945.[8] But the Secretary was not otherwise bound

6. The Sixth Circuit, in the course of reviewing the type of evidence that an employer may submit under § 727.203(b) to rebut the Part C interim presumption, has similarly concluded that § 902(f)(2) was not intended "to require continuance of the evidentiary rules applicable to Part B cases." *Ramey v. Kentland Elkhorn Coal Corp.*, 755 F.2d 485, 490 (6th Cir.1985).

7. We recognize that the distinction between medical criteria and evidentiary rules is necessarily somewhat elusive. While the requirements set out in § 727.203(a)(1)–(5) are medical criteria indicating the existence of a chronic respiratory or pulmonary impairment, the manner in which a miner demonstrates that he has satisfied any one of those requirements is an evidentiary matter. For example, the fact that certain opacities are revealed by a chest x-ray is a medical criterion of pneumoconiosis under (a)(1), but whether the x-ray actually reveals those opacities is a question of evidence.

8. Section 945 also provided for the review of pending and previously denied Part B claims by the Secretary of HEW. 30 U.S.C. § 945(a). Any claim not approved under this review process was to be referred to the Secretary of Labor and the claimant was to be given the opportunity to present additional medical and other evidence in support of his claim. For purposes of this subsequent review by the Secretary of Labor, however, such claims were to be treated as if they had been originally filed under Part C. *Id.* § 945(a)(3)(A).

by the Part B rules and was free to adopt his own adjudicative criteria for processing such claims.

## IV. The Board's Decision

■ A claimant who fails to establish his eligibility under the § 727.203 interim presumption is not automatically denied benefits. Instead § 727.203(d) allows such a claimant to attempt to establish his eligibility for benefits under the permanent Part C regulations set out at 20 C.F.R. §§ 718.1–718.404. The Administrative Law Judge, and by adoption the Board, reviewed the petitioner's claim in light of the criteria in Part 718 and concluded that there was insufficient evidence to establish that "Mr. Strike was suffering from a chronic, totally disabling pulmonary impairment arising out of coal mine employment or that his death resulted from such disease." [9] (Pl. App. 10).

■ Our review of a decision granting or denying black lung benefits is limited to determining whether that decision is supported by substantial evidence in the record. See *Amax Coal Co. v. Director, OWCP*, 801 F.2d 958, 961 (7th Cir.1986); *Peabody Coal Co. v. Director, OWCP*, 778 F.2d 358, 362 (7th Cir.1985). While the X-ray interpretations and medical reports submitted by the petitioner established that Mr. Strike had pneumoconiosis, there is substantial evidence in the record to support the Administrative Law Judge's finding that Mr. Strike was not totally disabled due to pneumoconiosis and that his death was not due to the disease. The sole exam-

ining physician's report stated that Mr. Strike had only "minimal restrictions in physical activity because of respiratory problems prior to [the] onset of lymphoma." A letter written by the same physician indicates that he was unable to substantiate Mr. Strike's complaint of chronic lung disease because of the symptoms associated with his lymphoma. The physician concluded that he believed "Mr. Strike had pneumoconiosis but that it was of a relatively mild to moderate nature." Mr. Strike's death certificate listed pneumonia and lymphoma as the causes of death, and the autopsy report diagnosed Mr. Strike as suffering from both of these diseases. Neither document, however, mentioned pneumoconiosis. On the basis of this evidence, the Administrative Law Judge properly concluded that the petitioner had failed to establish that Mr. Strike was totally disabled due to pneumoconiosis at the time of his death under the standards of 20 C.F.R. § 718.204(c), or that Mr. Strike's death was due to pneumoconiosis under the criteria of 20 C.F.R. § 718.205(b).

## V. Conclusion

The petitioner's claim was properly reviewed under the § 727.203 interim presumption and the permanent Part C regulations in Part 718. The Board's order denying the claim is supported by substantial evidence and is accordingly affirmed.

---

9. The Administrative Law Judge's opinion indicates that he reviewed the petitioner's claim in light of "the criteria set forth in the Act at 20 C.F.R. parts 410 and 718." The respondent Director seems to believe that having failed to qualify for benefits under the § 727.203 interim presumption, the petitioner's claim was subject to review under the old Part C permanent regulations promulgated by HEW, 20 C.F.R. §§ 410.-401–410.476, instead of the new Part C permanent regulations issued by the Department of Labor, 20 C.F.R. §§ 718.1–718.404. The Director cites the Board's decision in *Muncy v. Wolfe Creek Collieries Coal Co., Inc.*, 3 Black Lung Rep. 1–627 (1981), as support for that conclusion, although he notes his disagreement with the Board's holding.

Section 727.203(d) clearly states that claimants who fail to establish their eligibility under § 727.203 may attempt to establish their eligibility under the new Department of Labor Part C regulations. Prior to the effective date of those regulations, § 727.4(b) provided that "the provisions of Subpart D of Part 410 of this title which are not inconsistent with the 1977 amendments to the act, shall be applicable to the adjudication of claims under this part." Because the Administrative Law Judge considered the petitioner's claim long after the effective date of the Department of Labor's regulations, April 1, 1980, it seems clear to us that the petitioner's claims were subject to review under those regulations, not the old HEW regulations.