Henry CURSE and George
New, Petitioners,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNIT-
ED STATES DEPARTMENT OF LA-
BOR, Respondent.

Nos. 87–7134, 87–7375.

United States Court of Appeals,
Eleventh Circuit.

April 26, 1988.

Jenner & Block, Raymond T. Reott, Chi-
cago, Ill., for petitioners.

Nathaniel Spiller, Carol A. De Deo, Jef-
frey A. Hennemuth, Office of the Sol., U.S.
Dept. of Labor, Mark E. Solomons, Arter &
Hadden, Washington, D.C., for respondent.

John J. Bagnato, Spence, Custer, Saylor,
Wolfe & Rose, Johnstown, Pa., for amicus
Bethenergy Mines, Inc.

Allen R. Prunty, Jackson, Kelly, Holt &
O'Farrell, Charleston, W.Va., for amici Is-
land Creek Coal Co., Consol. Coal, et al.

Before FAY and KRAVITCH, Circuit
Judges, and ATKINS *, Senior District
Judge.

---

* Honorable C. Clyde Atkins, Senior U.S. District
Judge for the Southern District of Florida, sit-
ting by designation.

FAY, Circuit Judge:

The Black Lung Benefits Act ("the Act")[1] is designed to provide benefits to coal miners totally disabled by pneumoconiosis, or black lung disease. 30 U.S.C. § 901(a) (1982). Two former miners, Henry Curse and George New, who had previously filed class B claims and been denied benefits, received the opportunity to reapply for benefits through the 1978 amendments to the Act. Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95 (1978). Each chose Department of Labor ("DOL") review and, pursuant to the statute, presented new evidence to prove his disability. In each case, an administrative law judge found the claimant eligible for benefits and, following the directives set forth in the regulations, awarded retroactive payments starting from 1978. Curse and New each challenged the validity of the regulation and appealed his award, arguing that the statute required that the benefits date back to 1974. The Benefits Review Board considered the two cases together. The board upheld the regulation and the legislation,[2] and affirmed the award. In this appeal, the claimants make two arguments: (1) the regulation establishing the current system for calculating retroactive payments is inconsistent with the Act; and (2) if the regulation *is* consistent with the statute, then the Act itself violates the equal protection clause of the constitution. After carefully considering the issues, we find that the regulation reasonably interprets a constitutionally valid statute. Accordingly, we affirm the ruling of the Benefits Review Board.

1. 30 U.S.C. §§ 901–45 (1982 & Supp. III 1986).

2. Claimants had also challenged the validity of the Act if it were construed to permit the regulation at issue.

3. A number of studies establish the relationship between the length of employment in the mines and the existence of black lung disease. One autopsy study, for example, showed that, of 400 coal miners who had worked in mines for at least 21 years, an overwhelming 90–95% had black lung disease. *Stapleton v. Westmoreland Coal Co.*, 785 F.2d 424, 460 n. 14 (4th Cir.1986) (Sprouse, J., concurring), *reversed on other grounds,* — U.S. —, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987).

I. *Background*

A. The Black Lung Benefits Act

"[C]oal workers' pneumoconiosis, or black lung disease, is a dreadful and insidious disease which interferes with the respiratory functions of its victims, and which slowly and progressively makes the very act of breathing more and more difficult." 124 Cong.Rec. S2,333 (daily ed. Feb. 6, 1978) (statement of Sen. Williams). Black lung disease strikes a very high percentage of coal miners, particularly those who have worked in coal mines for a number of years.[3] It is an as yet incurable and irreversible disease which initially renders a coal miner unable to physically exert himself and ultimately causes the miner's death.[4]

Despite the pervasiveness of black lung disease among coal miners, this country did not recognize the problem until the 1950s. In 1969, acknowledging the need to implement health and safety measures that would reduce the risk of black lung disease and to provide benefits to coal miners totally disabled by black lung disease, Congress passed the Mine Safety and Health Act, 30 U.S.C. §§ 801–960 (1982 & Supp. III 1985).

Subchapter IV of the Mine Safety and Health Act, 30 U.S.C. §§ 901–45 (1982 & Supp. III 1985), deals exclusively with black lung benefits. The statute provides that state workers' compensation programs and responsible coal mine operators will ultimately bear the financial burden of paying these benefits. However, "Congress

4. Federal Judicial Center, *The Black Lung Act: An Analysis of Legal Issues Raised Under the Benefits Program Created by the Federal Coal Mine Health and Safety Act of 1969 (as Amended)* at 2 (1981) (Education and Training Series).

Black lung disease is just one form of pneumoconiosis. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 6 n. 2, 96 S.Ct. 2882, 2888 n. 2, 49 L.Ed.2d 752 (1976). In addition, a coal miner can contract either simple or complicated pneumoconiosis. *See id.* at 7, 96 S.Ct. at 2888. The types and degrees of pneumoconiosis, however, are not relevant to this case.

apparently concluded that, because the 1969 Act imposed new mine health and safety standards [on coal mine operators] without prior notice, it would be unfair to make operators responsible for benefits until they had a reasonable opportunity to comply with the standards." *Director, Office of Workers' Compensation Programs v. Bethlehem Mines Corp.*, 669 F.2d 187, 189 (4th Cir.1982) (footnote omitted). Consequently, Congress created two classes of claims.[5] Class B claims, filed before December 31, 1973, were to be paid by the federal government. The Secretary of Health and Human Services ("HHS")— through the Social Security Administration ("SSA")[6]—considered these claims. 30 U.S.C. §§ 921-25 (1982). Claims filed after December 31, 1973, called class C claims, were evaluated by the Department of Labor. Benefits for class C claimants were to be paid for by state workers' compensation programs or, where no adequate state program existed, by the responsible coal mine operators.[7]

### B. The Amendments

Congress became dissatisfied with the program that was set up to implement the Act. The legislature determined that the Act was being interpreted too restrictively.[8] Accordingly, in 1972, Congress amended the act in an effort to liberalize the evidentiary standards. Black Lung Benefits Reform Act of 1972, Pub.L. No. 92-303, 86 Stat. 150 (1972); *see* Solomons, *A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of Its Unresolved Issues*, 83 W.Va.L.Rev. 869, 870-73 (1981).

At the same time, Congress urged the Secretary of HHS to adopt regulations that would solve another problem: the tremendous backlog of class B claims. *Strike v. Director, Office of Workers' Compensation Programs*, 817 F.2d 395, 397 (7th Cir. 1987); *Talley v. Mathews*, 550 F.2d 911, 916 (4th Cir.1977). The Secretary, in response, adopted a set of interim standards that made it significantly easier for class B claimants to establish their eligibility for benefits. By establishing these rules, the Secretary hoped to enable class B claims to be reviewed more quickly and with more satisfactory results. In addition, the Secretary promulgated a set of permanent regu-

---

5. There are, technically, four classes of claims. *See* Habermann & Ramsey, *The Federal Black Lung Program—The View from the Top*, 87 W.Va.L.Rev. 575, 581-83 (1985) (describing classes of claims). For our purposes, though, it is simply necessary to distinguish between class B and class C claims.

6. Originally, the Department of Health, Education, and Welfare ("HEW") administered Class B claims. However, when HHS superceded HEW, it became responsible for class B claims.

7. 30 U.S.C. §§ 931-34 (1982 & Supp. III 1985). Because of the problems in identifying adequate state programs and responsible coal mine operators, the federal government had to finance a great share of the class C program. Congress amended the Act to establish a trust fund. An excise tax on the sale of coal finances the fund, which pays benefits in class C cases in which no state workers' compensation programs covers the claim and no responsible coal mine operator can be found. *See* 30 U.S.C. § 934 (1982); *Bethlehem Mines Corp.*, 669 F.2d at 190.

8. Over a hundred years ago, Emile Zola wrote his non-medical description of the coal miner in *Germinal*:

"Have you been working long at the mine?" He flung open both arms.

"Long? I should think so. I was not eight when I went down and I am fifty-eight. They tell me to rest, but I'm not going to; I'm not such a fool. I can get on for two years longer, to my sixtieth, so as to get the pension."

A spasm of coughing interrupted him again. "I never used to cough; now I can't get rid of it. And the queer thing is that I spit." The rasping was again heard in his throat, followed by a black expectoration.

"Is it blood?"

He slowly wiped his mouth with the back of his hand.

"No, it's coal. I've got enough in my carcass to warm me till I die. And it's five years since I put a foot down below. I stored it up, it seems, without knowing it."

---

Suffice it to say that this miner's widow, were she alive today, would have great difficulty in obtaining benefits. S. Rep. No. 743, 92nd Congress, 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin.News 2305, 2313.

lations for class C claimants.[9] These permanent regulations contained much more stringent standards than did the interim rules.[10] Consequently, the DOL claims had a much higher denial rate than the HHS claims. *Strike,* 817 F.2d at 398; Solomons, *supra,* at 873.

Between 1975 and 1977, Congress developed yet another set of amendments to the Act. These amendments further modified the existing evidentiary standards. The amendments also authorized the Secretary of Labor to create standards for class C claimants. 33 U.S.C. § 932(a) (1982 & Supp. III 1985). By stressing that these standards could be no more stringent than the standards governing class B claims, Congress hoped to equalize treatment of the two classes.[11]

In addition, Congress wanted to remedy past wrongs caused by the overly restrictive and complicated standards. Therefore, it provided both class B and class C claimants whose claims had been denied with one more chance to apply for benefits. 30 U.S.C. § 945 (1982). Class C claims, which had been denied based on the most restric-

tive criteria of all, automatically received reconsideration. 30 U.S.C. § 945(b) (1982). In reconsidering the claims, the Secretary of Labor had to apply its new, more relaxed evidentiary standards, and could request additional evidence from the claimant regarding the miner's disability. 30 U.S.C. § 945(b)(2)(B) (1982). Class B claimants, on the other hand, had six months from their date of notification in which to opt for reconsideration. The class B claimants had two choices: (a) review by the Secretary of HHS based on existing evidence; or (b) review by the Secretary of Labor, based on both existing and additional evidence.[12] In either case, the claim would be evaluated according to the new, modified evidentiary rules. 30 U.S.C. § 945(a)(1) (1982).

The statute unequivocally mandates that all claimants who reapply for benefits and are found eligible "shall be awarded benefits on a retroactive basis for a period which begins no earlier than January 1, 1974." 30 U.S.C. § 945(c) (1982). Beyond this general guideline, however, the statute provides no instructions regarding the date that retroactive payments should begin.

**9.** Under the original act and the act as amended in 1972, the Secretary of HHS created the rules for both classes of claimants. Consequently, the Secretary of Labor was powerless to correct the disparity of treatment between the two classes of claimants. Instead, he could only plead with the Secretary of HHS to adopt more liberal permanent criteria for class C claimants. *See* H.R.Rep. No. 151, 95th Cong. 2d Sess., pp. 15–19, *reprinted in* 1978 U.S. Code Cong. & Admin. News 237, 251–55; Solomons, *supra,* at 884–85.

**10.** Obviously, there was no backlog of class C claims, because none had been filed at this point. Thus, in devising the permanent regulations, the Secretary focused on developing medically accurate standards. The interim standards, on the other hand, attempted to alleviate the difficulty of establishing claims through medical evidence by instituting presumptions of black lung disease based on non-medical factors such as length of employment in the coal mines. *See* 30 U.S.C. § 921(c) (1982). The interim presumptions, although helpful in processing claims quickly and in improving the claims approval rate, have been criticized by some commentators as not scientifically and medically sound. *See* Solomons, *supra.*

**11.** 30 U.S.C. § 902(f)(1)(C) (1982); *see In re Sebben,* 815 F.2d 475, 480–81 (8th Cir.1987), *cert.*

granted, —— U.S. ——, 108 S.Ct. 1011, 98 L.Ed.2d 977 (1988).

Congress was clearly distressed by the unequal treatment of the two classes of claimants:

> For some inexplicable reason, the Department of Health, Education, and Welfare, exercising authority provided under the current law, has literally saddled the Department of Labor with rigid and difficult medical standards for measuring claimant eligibility under part C of the program. The so-called "permanent" medical standards now in effect under part C are much more demanding than the so-called "interim" standards applied by HEW under part B of the program.... The Congress did not intend ... that [the] "interim" approach would suddenly conclude at the termination date for new part B filings.

H.R.Rep. No. 151, 95th Cong., 2d Sess., p. 15, *reprinted in* 1978 U.S. Code Cong. & Admin. News 237, 251.

**12.** If the claimant chose the first path and was found ineligible, the Secretary of HHS would automatically forward the claim to the Secretary of Labor for review based on both existing and additional evidence. 30 U.S.C. § 945(a)(2)(B) (1982). Since neither claimant chose HHS review, we need not discuss it further.

Pursuant to his statutory authorization, the Secretary of Labor set up a system governing the payment of benefits for these reconsidered class B and class C claims. 20 C.F.R. § 727.302 (1987). No claimant can receive benefits for a period which commences earlier than January 1, 1974. 20 C.F.R. § 727.302(a) (1987). For class C claimants who can establish a date of onset for the disease, benefits are payable from the month of onset or January 1, 1974, whichever is later. 20 C.F.R. §§ 725.503(b), (e) (1987); *see* 20 C.F.R. § 727.302(e) (1987) (making section 725.503 controlling for reconsidered class C claims). Where the class C claimant cannot establish a date of onset, benefits are payable "beginning with the month during which the claim [is] filed." 20 C.F.R. § 725.503(b) (1987).

Class B claimants are treated slightly differently. Like class C claimants, class B claimants who can show when they were stricken with black lung disease receive retroactive benefits payable from the latter of the onset date or January 1, 1974.[13] If a class B claimant cannot establish the date of onset of disease, however, the DOL must first determine whether the claimant elected DOL or HHS review. If the claimant chose to have HHS review the claim, and, accordingly, presented no additional evidence to establish his claim, his retroactive payments date back to January 1, 1974. 20 C.F.R. § 702.302(b) (1987). This claimant, then, would receive the same benefits as a similarly situated class C claimant. A class B claimant who, like Curse or New, elects DOL review and is found eligible for benefits only after presenting new evidence to substantiate his claim, however, is treated differently. When a class B claimant who presented new evi-

dence cannot establish a date of onset, he only receives benefits payable from the month in which he elected DOL review.[14]

## II. *Analysis*

### A. Validity of the Administrative Regulation

#### 1. *Standard of Review*

We must first determine what standard of review to apply to the regulations. We agree with the Director that, in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court established the set of guidelines that governs our analysis. In *Chevron*, the Supreme Court instructed courts to conduct a two-part analysis when considering an agency's construction of the statute that it administers. First, the court must determine whether the statute itself answers the particular question. If the statute addresses the issue, then the court must simply make sure that the agency has given effect to "the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82 (footnote omitted). If there is no discussion of the precise issue within the statute, the court must ask a second question: Does the regulation constitute a permissible construction of the statute? *Id.* at 843, 104 S.Ct. at 2782. In evaluating the agency's stance, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11.

13. Benefits would never date back to the date of filing because by definition class B claimants would have filed their claims before the 1974 cutoff date. Class C claimants, on the other hand, by definition filed their claims past cutoff date; so, their filing date would always be the latter date.

14. *See* 20 C.F.R. § 727.302(c)(1), (d)(1) (1987); 20 C.F.R. § 725.503(b) (1987); *see also* 20 C.F.R. § 410.704(d) (1987) (giving class B claimants six months from time of notification in which to make their election).

Claimants appear to base their analysis on the presumption that *all* class B claimants whose claims are reviewed under 30 U.S.C. § 945 (1982) and who cannot establish a date of onset of disease only receive benefits dating back to their date of election. We believe that this is an erroneous interpretation of the regulations. Our interpretation is consistent with that suggested by the Director. *See* Brief for the Director, Office of Workers' Compensation Programs, at 32–34.

As we previously noted, the statute does not establish a starting date for payments that are awarded under 30 U.S.C. § 945 (1982). The only absolute guideline is that these payments shall not date back prior to January 1, 1974. Thus, under *Chevron*, we must determine whether the challenged regulation reasonably construes the statute.

### 2. *The Regulations*

▮ Unquestionably, whenever *any* claimant can establish the date of onset, the retroactive benefits begin at that date.[15] When the date of onset cannot be established, payments have traditionally started from the filing date. *See Director, Office of Workers' Compensation Programs v. Rochester & Pittsburgh Coal Co.*, 678 F.2d 17, 20 n. 6 (3rd Cir.1982) (citing 20 C.F.R. § 725.503(d) (1977)). Claimants Curse and New note that all class B claims were filed before 1974, the statutory cutoff date for retroactive payments. To be consistent with the legislature's mandate, they state, class B claimants who cannot establish a date of onset should receive benefits dating back to January 1, 1974.

We do not have to determine whether a regulation providing the suggested scheme would conform to the Act's general directives. We must only decide whether the system in existence is consistent with the Act. And, we find that the regulation does conform to the Act. As the Director reasons, these class B claimants, by electing to have their claims reconsidered, have essentially "refiled" their claims. They have the ability to present new evidence to establish their eligibility and, in general, are treated as class C claimants. *See* 30 U.S.C. § 945(a)(1)(B) (1982). One provision of the statute expressly states that "[f]or the purposes of any determination by the Secre-

tary of Labor under paragraph (3) [, which deals with class B claims reviewed by the DOL,] the date of [election] shall be considered the date of filing of the claim." 30 U.S.C. § 945(a)(4) (1982). We agree with the Director that this strongly indicates Congress' intent to treat these class B claims as having been *refiled* at the date of DOL election. It is obvious, then, that the regulatory scheme is consistent with both the Act and the traditional rule starting black lung benefit payments from the filing date when there is no ascertainable onset date.

In addition, legislative history supports the Director's position that the regulation as written most effectively carries out the statute's purpose. The legislative history shows that, in those cases in which class B claimants elected DOL review and presented new evidence to prove their eligibility, Congress viewed the claims as "refiled." *See* H.R.Conf.Rep. No. 864, 95th Cong., 2d Sess., p. 21, *reprinted in* 1978 U.S.Code Cong. & Admin.News 237, 314 (claimants can "elect to have HEW review the claim on the existing record or have the claim referred to the Department of Labor for *refiling* under part C with an opportunity to submit new evidence") (emphasis added). The report describes class C claims, on the other hand, as "reviewed" claims. *Id.* We feel that this distinction is significant, especially in light of the statute's provision that class B claims considered by the DOL are deemed to have been "filed" on the date of election.[16]

▮ We also note that, shortly after the Labor Department wrote the regulations, some members of the House Committee on Education and Labor sent the Department of Labor detailed comments about the regulations. The Congressmen critiqued the regulation at issue in this case, and ex-

---

15. The exception, of course, occurs when the onset date is prior to the statutory cutoff date of January 1, 1974. In that case, benefits would only date back to the cutoff date.

16. Curse and New argue that 30 U.S.C. § 945(a)(4) (1982) sets the date of election as the filing date so that class B claimants could have been evaluated under the permanent regu-

lations if they had been enacted by the election date. *See* Reply Brief of Petitioner's Henry Curse and George New, at 7. Again, we note that the burden is on claimants not simply to show that their interpretation is feasible, but to show that the regulation is not consistent with the statute. Claimants have not met this burden.

pressed some concern over the rule. Their criticism, however, stemmed from the fear that because the regulation did not emphasize the importance of the onset date, the department would not work hard enough to discover that date. Therefore, they feared that eligible claimants would not always receive their full share of retroactive benefits.[17] This critique does not disapprove of the election date cutoff so long as the department makes an effort to discover the actual onset date.[18]

Claimants argue that various statements appearing in the legislative history of the 1977 amendments show that Congress wanted all claimants unable to establish an onset date to receive benefits dating back to January 1, 1974. *See* Brief of Petitioners, at 19–22. We have carefully considered the statements to which claimants refer, however, and we do not find them persuasive.

In addition, we reject claimants' argument that because part of the purpose of the 1977 amendments is to equalize treatment of the two classes, the regulation providing for different, less favorable treatment of class B claimants conflicts with the statute. Congress has statutorily set up different systems to govern class B and class C claims. Class B claims are evaluated by the SSA, while class C claims are reviewed by the DOL. Federal funds finance the payments of class B benefits, while state workers' compensation programs and the coal mining industry bear the responsibility for paying class C claims. Most significantly, 30 U.S.C. § 945 (1982), which provides for the review of previously denied black lung claims, distinguishes between class B and class C claims. Class C claims automatically receive review, and

claimants automatically may present new evidence to substantiate their claims. 30 U.S.C. § 945(b) (1982); *see Old Ben Coal Co. v. Luker*, 826 F.2d 688, 693 (7th Cir. 1987). However, class B claimants must affirmatively elect review by either the HHS or the DOL, 30 U.S.C. § 945(a)(1) (1982); if they fail to do so, they waive their right to review. *See Old Ben Coal Co.*, 826 F.2d at 693. It is clear that, although Congress intended to provide all claimants with equally liberal medical criteria and evidentiary rules, it did not mean to abolish all distinctions between the two groups. Therefore, a regulation distinguishing between the two classes in some manner is not automatically irreconcilable with the Act.

Finally, we are not persuaded by claimants' argument that, by mandating that retroactive payments "shall" be awarded, the statute precludes the regulations at issue. The statute does not order that all claimants receive benefits dating back to January 1, 1974 in all cases. Instead, it unambiguously establishes January 1, 1974 as the cutoff date before which *no* benefits shall be awarded. 30 U.S.C. § 945(c) (1982). The provision, therefore, lends virtually no support to claimants' case.

Thus, we conclude that the regulations represented a reasonable interpretation of the statute.

## B. The Constitutionality of the Statutory Provision

■ Claimants also assert that if the statute permits the system set up by the regulations, then the statute is unconstitutional. They contend that the statute violates the Constitution's equal protection clause by treating class B claimants who choose DOL review and cannot prove a

---

17. The Congressmen urged the department to emphasize "that resort to the back pay cutoff device should not be had until the reviewing official is certain that a month of onset cannot be established." Letter from Representatives John Dent, Carl Perkins, & Paul Simon to Robert B. Dorsey, Chief, Branch of Claims Determination, Division of Coal Miners Workers' Compensation, at 9 (May 25, 1978) (discussing parts 727 and 725 of the propsed regulations) (included in Addendum to Brief for the Director).

18. As contemporaneous statements made by legislators who worked on the statute, we find the evidence helpful in clarifying legislative intent. *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 534, 102 S.Ct. 1912, 1924, 72 L.Ed.2d 299 (1982); *see also Stapleton*, 785 F.2d at 457 (Sprouse, J., concurring) (describing the "extraordinary steps taken by the authors and supporters of the [black lung] legislation to assure agency regulation fit to congressional intent").

date of onset of disease differently from similarly situated class C claimants without any rational basis. We disagree, and hold that the statute is constitutionally sound.

■ The equal protection clause of the Constitution "directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920)). When a statute fails to treat classes alike, it may constitute a violation of the equal protection clause. However, courts acknowledge the legislature's "substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the [federal government] to remedy every ill." *Plyler*, 457 U.S. at 216, 102 S.Ct. at 2394. Consequently, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The deference accorded to legislative enactments is very great when economic or social legislation is at issue. *Id.*[19]

In addition, we note that Congress' decision to give these claimants another chance to apply for benefits constitutes an act of legislative grace. The claimants had no contractual right to a second chance at benefits. This is another reason for adopting an extremely deferential approach when evaluating the statutory provision. *See generally United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

In light of this standard we cannot say that the legislation is constitutionally in-

firm. It was reasonable for Congress to set limits on the award of retroactive benefits. The 1977 amendments, by reopening previously denied claims, greatly increased the cost of the black lung benefits program. *See* 126 Cong.Rec. H31,257 (daily ed. Dec. 1, 1980) (statement of Rep. Perkins). In addition, by shifting financial responsbility for reviewed class B claims from the federal government to coal mine operators, Congress greatly increased the already heavy financial burden being borne by the coal mining industry. *See* 126 Cong. Rec. H31,259 (daily ed. Dec. 1, 1980) (statement of Rep. Wampler). It is altogether possible that Congress wanted to minimize the burden the new legislation shifted to the coal mine operators in order to minimize the possibility of funding problems.[20]

When there are economic limitations on Congress' ability to provide benefits, "it is not constitutionally impermissible for Congress to have drawn lines between groups of employees" concerning benefits, so long as there is a rational basis supporting the decision. *Fritz*, 449 U.S. at 177, 101 S.Ct. at 461. We feel that Congress had a sufficient basis for its decision to limit the amount of retroactive benefits awarded to class B claimants who elected DOL review and could not establish an onset date. Because the changes in evidentiary criteria were much more dramatic for class C than for class B claimants, Congress could have reasoned that class C claims were more likely to need to adjust their proof to fit the new rules than class B claimants. Class B claimants, on the other hand, were likely to introduce new evidence because, when they initially filed for benefits, they simply did not have sufficient evidence to support their claims. Accordingly, Congress might have decided that equitable reasons justified awarding retroactive benefits starting from 1974 for class C claimants who presented new evidence and could not

---

19. A court's review of legislation is much less deferential when a statute makes a suspect classification or one which impinges on a fundamental constitutional right. *See, e.g., Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

20. The program did in fact have funding problems—problems blamed partly on the 1977 amendments. *See* 126 Cong.Rec. H31,257–61 (daily ed. Dec. 1, 1980) (arguing for increased tax on coal mine operators to increase revenue in trust fund).

prove an onset date but not for similarly situated class B claimants.[21]

In addition, Congress apparently was concerned about the unfairness of imposing the financial burden for the class B claims on coal mine operators. *See Bethlehem Mines Corp.*, 669 F.2d at 189; *see also* 126 Cong.Rec. H31,257–58 (daily ed. Dec. 1, 1980) (statement of Rep. Perkins). This was an additional cost not previously carried by the coal mining industry. Thus, Congress may have felt it necessary to limit the award of retroactive payments of class B claims to either the point at which the miner contracted the disease or the point at which the evidence ultimately used to prove the case became a part of the case.

We feel that, together, these reasons are more than adequate to support Congress' decision.

### Conclusion

For all the reasons discussed above, we find that the regulation and the statute are valid.

AFFIRMED.

---

**21.** Congress could also have decided to be more generous with class C claimants because they had suffered the greatest injustice in the past.