**FLORIDA STATE CONFERENCE OF NAACP BRANCHES, Cynthia Slater, Jimmon Watson, and Crystal Lewis, Plaintiffs,**

v.

**CITY OF DAYTONA BEACH, FLORIDA, Kenneth Small, and Paul Skinner, Defendants.**

No. 99–406–CIV–ORL–19A.

United States District Court, M.D. Florida, Orlando Division.

April 8, 1999.

Mark R. Brown, Stetson Univ. College of Law, St. Petersburg, FL, Charles Gilbert Burr, III, Karen M. Doering, Burr & Smith, LLP, Tampa, FL, Godwin J. Essien, Essien & Associates, PA, Daytona Beach, FL, for plaintiffs.

Marie Simone Hartman, Daytona Beach, FL, for defendants.

## ORDER

FAWSETT, District Judge.

This cause came before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2, filed April 5, 1999) and Defendants' Response to Motion for Preliminary Injunction (Doc. No. 7, filed April 7, 1999).

## I. BACKGROUND[1]

This case arises out of Defendants' attempt to restrict vehicular access to Atlantic Avenue in Daytona Beach, Florida during the annual event known as Black College Reunion ("BCR"). BCR began in 1984 and is held in the City of Daytona Beach, Florida, which abuts the Atlantic Ocean on a barrier island. BCR is an event which has been attended by 100,000 persons in the past, a large number of whom are neither residents nor local occupants. (Doc. No. 12, ¶ 6). BCR began as a "homecoming between two historically black Florida colleges: Bethune–Cookman College and Florida A & M University." (Doc. No. 2, Exh. C, ¶ 2). BCR now "attract[s] participants from all 105 historically black colleges and universities throughout the United States." *See id.* The gridlock caused by the large number of cars swelling the community is described in the record. The record reflects that Daytona Beach withdrew its participation and sponsorship of this event during 1998. BCR 1999 is scheduled to be held from April 9–11.

---

1. Since the Court is mindful of the aphoristic wisdom that "justice delayed is justice denied," the Court will dispense with some of the details that might otherwise be included in this opinion. Moreover, early resolution of the motion will allow the parties a greater chance to resolve their differences informally.

Plaintiffs Slater, Watson, and Lewis have attended BCR in the past and intend to do so this year. (Doc. No. 2, Exhs.C–E). Plaintiff NAACP seeks to secure the "equal treatment of African–American persons." (Doc. No. 1, ¶ 5).

Plaintiffs filed the instant Motion for Preliminary Injunction on April 5, 1999. (Doc. No. 2). Defendants responded to the motion on April 7, 1999. (Doc. No. 7). A seventy-five minute hearing was held on April 8, 1999, at which the parties presented oral arguments.

Essentially, Plaintiffs complain that the Traffic Management Plan ("TMP"), which Defendants intend to impose during BCR 1999, would violate their First Amendment rights of association and assembly, equal protection rights, and rights to intra- and inter-state travel under the Dormant Commerce Clause [2] and Article IV, Section II of the Constitution. (Doc. No. 2). The TMP calls for all six bridges leading to the City of Daytona Beach ("Daytona Beach") to be blocked to vehicular traffic during specified periods of congestion and gridlock.[3] *Id.*, Exh. A; (Doc. No. 10). Defendants admit there is no objective standard to determine when such blockage will occur. *See* (Doc. No. 10). However, under the plan, certain individuals will be given passes to drive their vehicles across certain bridges and into Daytona Beach, even while others are not allowed entrance in their vehicles.[4] *Id.*, Exh. A, at 2. The excepted individuals include Daytona Beach residents, business owners and employees, and registered hotel guests. *Id.* All others will be forced to park their cars in lots and take shuttles to cross the bridges into Daytona Beach, to walk to such destination, or to await entrance over the bridges in their vehicles at such time as they are allowed to enter in the discretion of the authorities. *See id.*

Defendants respond that they regulate traffic during all the special events which occur in Daytona Beach. At oral argument, Defendants adverted to Bike Week 1999 as an example of proposed bridge closures similar to the present case. Bike Week 1999 began on February 26, 1999 and concluded on March 7, 1999. (Doc. No. 12, Exh. 3). The Public Service Announcement for Bike Week 1999, which was submitted by Defendants, included the following language:

> In order to respond to public safety concerns arising from traffic saturation and potential gridlock in the beachside area, a Contingency Traffic Management Plan may be placed into effect on a temporary basis when/if need arises. This would include limiting access to the beachside at the bridges.

*See id.*, Exh. 3, at 2. However, this language did not specify whether all six bridges to Daytona Beach would be closed, how long the bridges would be closed, or who would be granted access to the area. In addition, unlike this case, there is no indication that passes were granted to favored groups during other events. Moreover, Defendants admitted that no bridges were closed during Bike Week 1999. In fact, Defendants conceded at oral argument that the only time a bridge to Daytona Beach has been closed previously for an event was for Bike Week 1994, and for that event it is not clear how long or whether all six bridges leading to Daytona Beach were closed or, if so, whether certain individuals were allowed unrestricted access.[5] Finally, a review of the record

---

**2.** U.S. Const., Art. I, § 8, Cl. 3.

**3.** Counsel for Defendants stated at oral argument that one bridge was being reserved for use of shuttles, which are available to all individuals, and emergency and law enforcement vehicles. The use of one bridge in this restricted manner for access to Daytona Beach does not appear to implicate constitu-

tional issues, nor was it challenged by Plaintiffs in their submissions.

**4.** At oral argument, counsel for Defendants also stated that 75,000 passes had been issued as of the time of the hearing.

**5.** Counsel for Daytona Beach recounted the traffic problem during Spring Break 1989. Attendance at that event was increased due to

concerning measures taken during other events, including Spring Break and Race Week, reveals that none involved the exclusion of vehicles driven by persons who do not fall within limited, identifiable categories to whom passes were given. *See* (Doc. No. 12, Mercer Aff.).

## II. STANDARD

In order to prevail on a motion for preliminary injunction, Plaintiffs have the burden of proving the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that their own injury outweighs the injury to Defendants; and (4) that the injunction would not disserve the public interest. *Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627 (11th Cir.1992). Because injunctive action is an extraordinary and drastic remedy, it is the exception rather than the rule, and Plaintiffs must clearly carry the burden of persuasion. *See United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983).

## III. DISCUSSION

This case involves the difficult balance of competing interests, such as public safety, traffic congestion, access to homes, work, and facilities, and protection of property, with constitutional rights, such as freedom of association, travel, and speech and equal protection of the laws. The record reflects considerable effort by Defendants as well as many members of the community to develop a plan to accommodate these conflicting interests for the upcoming BCR weekend. Both Plaintiffs and Defendants agree that vehicular gridlock in the City of Daytona Beach during BCR warrants regulation. Both sides agree that authorities may regulate the public highways within their jurisdiction so long as such regulation comports with the law.[6] The issue between the parties is the manner of regulation in the TMP proposed for BCR 1999.

For the reasons that follow, the Court finds that portions of the TMP for BCR 1999 violate the First Amendment's guarantee of the right to assemble, the Fourteenth Amendment's guarantee of the right to equal protection under the law, and the right to travel under the Dormant Commerce Clause of the Constitution. Having reached this decision, the Court declines to reach Plaintiffs' other arguments at this time.

### A. Dormant Commerce Clause

Article I, Section 8 of the United States Constitution delegates to the Congress "the authority to regulate interstate commerce." *See Edwards v. California,* 314 U.S. 160, 172, 62 S.Ct. 164, 86 L.Ed. 119 (1941). Moreover, the United States Supreme Court stated that "it is settled beyond question that the transportation of persons is 'commerce,' within the meaning" of the Commerce Clause. *See id.* In *Edwards,* the state of California made it a crime to bring indigents into the state. *See id.* at 165–66, 62 S.Ct. 164. In striking down this law, the United States Supreme Court held that states cannot enact laws which favor the residents of a state over

---

Fort Lauderdale's efforts to discourage Spring Break participants from visiting their town. According to Defendants' counsel, traffic was backed up all the way to Interstate 95, which is a significant distance from Daytona Beach. In response to questioning from the Court, counsel acknowledged that no bridges were closed during Spring Break 1989. Moreover, Daytona Beach's response to Spring Break 1989 was to close some residential areas during Spring Break 1990. Once again, the bridges were not closed, nor is there evidence in the record that bridge closures were contemplated.

6. On this point, the Third Circuit stated as follows:

> Unlimited access to public fora would result not in maximizing individuals' opportunity to engage in protected activity, but chaos. To prevent that, state and local governments must enjoy some degree of flexibility to regulate access to, and use of, the publicly held instrumentalities of speech and travel.

*See Lutz v. City of York, Pa.,* 899 F.2d 255, 269 (3d Cir.1990).

nonresidents. *See id.* at 173–74, 62 S.Ct. 164.

Since this case involves people from across the country (Doc. No. 2, Exh. C), the Dormant Commerce Clause is implicated. It is clear that Defendants are giving preferences in access to Defendant City to residents over non-residents. Each of the favored groups that are entitled to vehicle passes allowing entrance to the City by vehicle includes individuals who are residents or who benefit residents.[7] Consequently, the provision for passes contained in the TMP proposal for BCR 1999 violates the Dormant Commerce Clause. Further, the provision for passes in combination with the subjective discretion of the authorities to close bridges to vehicular access by persons who do not hold such passes, as is discussed below, also violates the Dormant Commerce Clause.

## B. Equal Protection

█ The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly circumstanced shall be treated alike." *See Curse v. Director, Office of Workers' Compensation Programs,* 843 F.2d 456, 463 (11th Cir.1988); *see also Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.1980)[8] (noting that a party bringing an equal protection claim must be similarly situated to a group receiving preferential treatment). When government action "fails to treat classes alike, it may constitute a violation of the equal protection clause." *See Curse,* 843 F.2d at 463. However, such action will be upheld if it is "rationally related to a legitimate state interest."[9] *See id.*

█ As noted above, the provision for closing all six bridges leading to the City of Daytona Beach is unique to the Traffic Management Plan for BCR 1999. In addition, the issuance of passes in favor of certain individuals is also unique to such plan. Defendants claim that the BCR participants are not similarly situated as the participants of other events. In this regard, Defendants suggest that the congestion is due to BCR participants socializing with pedestrians while driving or in relation to their vehicles while on Atlantic Avenue (Highway A1A) in Defendant City. However, Defendant Skinner suggests that the socialization results from the traffic congestion. *See* (Doc. No. 11, ¶ 3). Whichever reason is correct, Defendants have not proffered a rational explanation for why BCR as an event should be singled out and subjected to greater restrictions than other events or why an objective traffic management plan directed to vehicular gridlock on Atlantic Avenue and applicable to all non-emergency and law enforcement vehicles, without regard to status of occu-

---

7. The only favored groups that are not residents or business owners are employees and hotel guests. Upon closer inspection, it appears that these groups also benefit Daytona Beach business owners. Business owners need employees to come to work to maintain their businesses in the Defendant City, and hotel guests provide income to the hotel operators of the City of Daytona Beach.

8. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

9. The standard applied to cases involving race is greater than "rational relationship." Also, while the Defendants argue that the TMP is not to be implemented just because BCR is primarily a black constituent event, it is racial impact, not discriminatory purpose, which is the critical factor under the law. However, the Court notes that Defendants assert they have not had an adequate opportunity to respond to the race charges made by Plaintiffs. Moreover, certain Plaintiffs have been aware of the TMP proposed for BCR 1999 since at least January of 1999 but failed to bring suit until April 5, 1999. (Doc. No. 12, Exh. 5). Thus, the Court will not determine the contention of Plaintiff that the TMP for BCR 1999 constitutes a denial of equal protection based on race at this time. Additionally, since the Court is granting the Motion for Preliminary Injunction on other grounds, the Court need not decide the race issue at this time.

pant(s) as visitor or "local," cannot be developed to be applied to any occasion in which such gridlock occurs instead of singling out one event, Black College Reunion 1999, for implementation of such plan [10]. In legal parlance, Defendants have not demonstrated that BCR participants are not similarly situated as participants in other activities and, thus, Defendants have not justified the differential treatment.

### C. Right to Assemble

■■■ The right to assemble is protected by the First Amendment to the United States Constitution. Restrictions of this right are proper only when they relate to the time, place, or manner of the assembly and "are narrowly tailored to serve significant governmental interests and leave open ample alternative channels of communication." *See Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523 (11th Cir.1985). Requiring a residence, business ownership, rental of a hotel room in a beach community, or a job in order to be given priority in the right to assemble denies individuals "an equal opportunity to be heard" and to assemble. *See id.* The right to assemble is " 'available to all, not merely to those who can pay their own way.' " *See id.* (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)).

The Court finds that granting the passes proposed in the TMP for Daytona Beach residents, registered hotel guests, and business owners and their employees does not comport with the First Amendment's guarantee that the right of assembly will not be tied to an individual's economic status or residence. Although Daytona Beach is offering shuttle service to the beach and attendees who are physically able may walk from the mainland over the

bridges to the beach side, such alternatives to those offered to a select group who are able to drive to such area based on their economic or residence status constitute an unwarranted impediment to freedom of assembly in the Daytona Beach area. Daytona Beach implicitly acknowledges this conclusion by offering favored status in the form of passes to its residents, hotel guests, and business owners and employees.[11]

The TMP for BCR 1999 vests unbridled discretion in local law enforcement officials to determine when those without passes will be prevented from crossing the bridges to enter the City of Daytona Beach. *See* (Doc. No. 10, Small Aff., ¶ 6) (acknowledging that the TMP for BCR 1999 provides "no objective standard"). The TMP provides that it shall be implemented "if traffic on Atlantic Avenue became congested to the point that public safety was jeopardized." *See* (Doc. No. 2, Exh. A, at 2). Thus, the bridges can be closed to vehicular traffic except for those persons who have been issued passes for such number and length of times as local law officials determine in their sole discretion.

■■■ At oral argument, Daytona Beach defended this provision by suggesting that traffic control is an "art" and defies objective criteria. However, the United States Supreme Court has stated that " [a] governmental regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.' " *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130–31, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (quoting *Heffron v. International Society for Krishna Consciousness*,

---

10. In this regard, the TMP, by its terms, applies solely to BCR. Further, there is evidence in the record of antipathy toward this event by community leaders as well as withdrawal in 1998 of its previous support of this event by Defendant City.

11. The Court notes that the argument by counsel for Defendants that Daytona Beach is restricting vehicles rather than people is also belied by the favored status granted to certain individuals.

*Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). Amplifying this conclusion, the Court stated that if a regulation " 'involves appraisal of the facts, the exercise of judgment, and the formation of an opinion,' " by the regulating authority, " 'the danger of censorship or abridgement of our precious First Amendment freedoms is too great' to be permitted." *See* *id.* (citations omitted).

The TMP's amorphous standard, which is congestion that "jeopardizes public safety," is too vague to allow meaningful review by the judiciary. Thus, the lack of objective standards in the TMP for BCR 1999 would prevent a court from determining whether local law enforcement deviated from the law in favor of or against a particular group. Consequently, local law enforcement could implement the TMP at its whim to discourage or prevent certain individuals from access to the City of Daytona Beach. Such result is incompatible with the First Amendment.

Thus, the Court finds that in these two regards, the provisions for access to the City of Daytona Beach during BCR 1999 are not narrowly drawn to meet the problem of traffic gridlock and are not reasonable as to time, place, and manner.

### IV.  CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2, filed April 5, 1999) is **GRANTED.** Defendants are enjoined from implementing bridge closures in the manner described in the Traffic Management Plan [12] and are further enjoined from granting favored status to certain individuals by the use of passes for vehicular access as described in the Traffic Management Plan proposed Black College Reunion 1999.

---

12.  The exception is described in note 3, *supra.*